DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Gerald Robinson, appeals his conviction for murder entered by the Lucas County Court of Common Pleas in the above-captioned case. For the reasons that follow, we affirm the judgment of the trial court. *Page 2 
 {¶ 2} On May 3, 2004, appellant was indicted on a single charge of aggravated murder, in violation of R.C. 2903.01(A). The crime with which appellant was charged occurred on April 5, 1980, just over 24 years prior to the issuance of the indictment.
 {¶ 3} At arraignment, on May 7, 2004, appellant entered a plea of not guilty. Thereafter, he filed a motion to compel production of any audiotapes and any supplemental notes, police reports, or summaries involving police interviews with appellant that had taken place on or about April 18 and 19, 1980. In addition, he filed a motion to suppress statements that he made to Toledo police during an interview at appellant's home on April 23, 2004, and to suppress any evidence that may have been obtained from those statements.
 {¶ 4} On February 3, 2006, the trial court heard evidence on both of these motions. In a judgment entry dated March 20, 2006, both motions were denied. Among the trial court's findings in support of its denial of appellant's motion to compel were: (1) that appellant's interviews with the police on April 18 and 19, 1980, were never tape-recorded, and, as a result, audiotapes of those interviews could not be produced; (2) that written notes of the interviews that were taken by Detective Arthur Marx could not be located by the prosecution and, for this reason, could not be produced; (3) that while the written notes from the 1980 interviews could potentially be useful to appellant, appellant failed to establish that the Toledo Police Department exercised bad faith in its failure to preserve those written notes. *Page 3 
 {¶ 5} Rejecting an additional argument by appellant that the absence of interview notes, together with the absence of notes of referral to a polygrapher, constituted a violation of appellant's due process rights, the trial court found that appellant had failed to establish that any of the notes could be deemed to contain materially exculpatory evidence.
 {¶ 6} The trial court based its denial of the motion to suppress on a finding that, contrary to appellant's contention, appellant had not been subject to a custodial interrogation during the April 2004 interview that was conducted in his home.
 {¶ 7} Prior to trial, the state of Ohio amended the indictment to charge the lesser included offense of murder.
 {¶ 8} Trial in the matter took place before a jury, beginning on April 17, 2006 and ending May 11, 2006. At trial, evidence of the following was adduced.[1] At approximately 8:20 a.m. on April 5, 1980, the body of 71 year-old Sister Margaret Ann Pahl, a Catholic nun, was found in the sacristy of the chapel in Toledo, Ohio's Mercy Hospital. She was lying flat on her back, with her arms to her sides, her legs together and *Page 4 
straight, her habit pulled neatly up to her breasts, and her underwear pulled down around her right ankle. Her assailant had strangled her to the verge of death and then stabbed her 31 times. Initially, she was stabbed nine times through an altar cloth that her assailant had placed over her body. The altar cloth was then removed and Sister Paul was stabbed 22 more times to her face, neck and chest.
 {¶ 9} Within minutes after the gruesome discovery was made, Toledo Police detectives arrived at the hospital and began their investigation. By the end of that first day of investigation, detectives had concluded that Sister Pahl had not interrupted a robbery. Assistant Chaplain Father Jerome Swiatecki had done a complete inventory of the sacristy in the chapel and reported that nothing of value was missing. In addition, Sister Pahl's purse was recovered from inside one of the cabinets in the sacristy. The only items not accounted for were a pair of sewing scissors that were normally kept in the sacristy and Sister Pahl's wrist watch.
 {¶ 10} Investigators further believed that the murderer was someone who was angry at Sister Pahl and most likely knew her. According to testimony by Detective Art Marx, the fact that there were 31 stab wounds indicated that the assailant was very angry. Marx further testified that such an elevated level of anger was inconsistent with the assailant having been a complete stranger to the victim. *Page 5 
 {¶ 11} At some point on the day of the murder, before an autopsy had been conducted, Assistant Lucas County Coroner Dr. Renate Fazekas[2]
told Det. Marx that it appeared that the victim had been "strangled from behind by an individual with large hands." This opinion, according to Det. Marx's report, was based on the fact that "a rather large bruise was noticed on the back neck." However, also noted in the detective's report was a statement by Dr. Fazekas that "the cause of death could not be determined until after a complete autopsy."
 {¶ 12} The next day, Sunday, April 6, 1980, investigators received additional information from the coroner's office that the weapon used to inflict the stab wounds had a blade that was no more than, but was possibly less than, 1/2-inch in width and was at least 3 inches in length.
 {¶ 13} By Monday, April 7, 1980, investigators believed that, despite Sister Pahl having been found in a state of substantial nudity, this crime was not motivated as a sexual assault. The physical evidence simply did not indicate that Sister Pahl had been raped. Her hymen was intact, and there was no evidence of semen found on her person or at the crime scene. The only indication of any sort of genital injury was a scratch on the right side of the labium and hymen measuring 1/2" by 1/8". According to a police *Page 6 
report by Detective Weinbrecht, it was Dr. Fazekas's opinion that the abrasion may have been caused by a fingernail or a rough instrument, and may have been inflicted to mislead investigators into thinking a rape had been committed.
 {¶ 14} Five days after the murder, on April 9, 1980, police interviewed Shirley Lucas, who was a housekeeper for Mercy Hospital. She stated that on Good Friday afternoon, April 4, 1980, Sister Pahl, who was "very serious about her religion", had been upset because "one of the priests" had shortened the Good Friday services. According to Lucas, Sister Pahl had said to her, through tears, "Why did they cheat God out of what was his?"[3]
 {¶ 15} On or about April 13, 1980, police interviewed Wardell Langston, who was a janitor at the hospital. Langston reported to police at that time — and later testified at trial — that at approximately 7:30 a.m. he had been cleaning the floor under the balcony in the Professional Building, when he heard frantic footsteps coming from a hallway above, which connected to the chapel.[4] The footsteps were then heard to go around the *Page 7 
balcony and down a second hallway which led to a single residence, the residence that was occupied by appellant.
 {¶ 16} After 13 days of investigation, the police believed that the evidence pointed to appellant as the principal suspect. Appellant was asked to appear at the Toledo Police Department for an interview on April 18, 1980. During the interview, which was conducted by Lt. William Kina and Det. Marx, appellant claimed that Sister Pahl's killer came to him and confessed to her murder. When pressed for details and specifics, appellant admitted that his statement was a lie and that he had made up the story to protect himself.[5]
 {¶ 17} At the conclusion of the interview, appellant consented to a search of his residence. During the search, police recovered an eight-inch long sword-shaped letter opener. The blade of the letter opener was approximately 1/2" wide. Near the handle of the letter opener was a nickel-sized circular medallion with an embossed depiction of the United States Capitol.
 {¶ 18} Appellant was interviewed again on April 19, 1980. The interview came to an abrupt end when Toledo Police Deputy Chief Ray Vetter, himself a practicing *Page 8 
Catholic, intruded upon the session and brought Monsignor Schmit of the Toledo Diocese into the interrogation room. Within minutes, appellant and Monsignor Schmit simply walked out of the police station. Both Marx and Kina testified that an interruption in a police interview such as had occurred during appellant's April 19, 1980 interview was highly unusual, and in the case of the April 19, 1980 interview, was highly unwelcome.
 {¶ 19} Not only was the April 19, 1980 interview cut short, but any police notes from that interview, and from the interview of April 18, 1980, have been lost or are no longer in existence. Det. Marx testified that he was certain he had made reports of those interviews back in 1980, but he could not explain what may have happened to them or when it may have happened. Dep. Chief Vetter testified that in 1980, at that time the missing police reports would have been generated, there would have been three copies of each report — "an original and two carbons" — and that the officer who made the report would keep one copy, the officer's captain would keep the other copy, and the original would go to Vetter. According to Lt. Kina, at the time the April 18 and 19, 1980 interviews were conducted, Dep. Chief Vetter had a locked cabinet where he would keep all three copies of police reports involving "very sensitive cases."
 {¶ 20} During the initial weeks following Sister Pahl's murder, police followed up on the report about scissors being missing from the chapel sacristy. Sister Kathleen Mary showed police a pair of scissors similar to the missing pair, and on April 22, 1980, *Page 9 
Detective David Weinbrecht showed the sample scissors to Dr. Fazekas. According to Det. Weinbrecht's report:
 {¶ 21} "The opinion of [Fazekas] is that the scissors very well could have been the weapon, but would not say with 100% certainty. She stated that some of the punctures on the body appeared to be made with the scissors closed and some with the scissors open. The neck wounds appeared to be made with the scissors open. The stated that the wounds on the victim's face appeared to have been made with a weapon, sharper than the scissors."
 {¶ 22} Several days later, Det. Weinbrecht showed Dr. Fazekas the sword-shaped letter opener that was recovered from appellant's room. According to the detective's April 25, 1980 report, Dr. Fazekas's conclusion was that "the instrument was compatible with each of the wounds found in the body and could have been the weapon used."
 {¶ 23} Two days before Dr. Fazekas was shown the letter opener, Toledo Police Senior Criminologist Edward Joshua Franks had performed his own examination of the instrument. At trial, Franks described the letter opener as having been" . . .sumptuously clean. . . . It didn't have any fingerprints, no stains, no smear marks . . . — it appeared as if it had been polished." When he removed the medallion, however, he found a small particle of material which, when tested using the chemical phenolphthalein, tested presumptively positive for the presence of blood. Because of the small amount of *Page 10 
available material, Franks was unable to conduct a further test to confirm the presumptive test result.
 {¶ 24} Near the end of April 1980, Toledo police presented their evidence to the Lucas County Prosecutor's office. The prosecutor's office declined to present the matter to the grand jury at that time because the evidence was deemed insufficient.
 {¶ 25} According to Det. Marx, for months after April 1980 — even years, periodically — the Toledo Police Department continued to try to develop further evidence in the case.
 {¶ 26} In December 1999, the Toledo police submitted the letter opener to the Ohio Bureau of Criminal Identification and Investigation (BCI), where forensic scientist Cassandra Agosti performed a presumptive blood test using the chemical tetramethylbenzidine. A swab from the area surrounding the medallion tested presumptively positive for the presence of blood.
 {¶ 27} In 2000, BCI forensic scientist Diane Gehres performed PCR and STR DNA analysis on two swabs from the medallion, but no DNA was detected.
 {¶ 28} On December 2, 2003, the case caught the attention of Toledo Police Department Cold Case Unit investigators. Cold case investigator Thomas Ross testified that the purpose of the cold case unit is to apply new technology to old, unsolved cases and, through the collaborative effort of a multi-discipline task force, attempt to bring those cases to a successful conclusion. Members of the cold case unit who took part in *Page 11 
investigating the instant case included, in addition to investigator Ross of the Lucas County Prosecutor's Office, Sgt. Steve Forrester of the Toledo police, forensic pathologist Diane Scala-Barnett, members of the Bowling Green BCI DNA team, including forensic scientists Agosti and Gehres, and forensic anthropologists Dr. Frank Saul and Julie Saul.
 {¶ 29} What brought the case to the attention of the cold case unit in December 2004 was a letter, originally sent to the Ohio Attorney General's Office.[6] On December 8, 2003, investigators interviewed the person who had sent the letter to the Attorney General's Office. During this interview, the author of the letter advised the police that they should look for an upside down cross on Sister Pahl's chest.
 {¶ 30} In the months that followed, investigators located and examined the physical evidence, interviewed original investigating officers, re-interviewed witnesses, and had physical evidence examined by specialized experts.
 {¶ 31} Deputy Lucas County Coroner and forensic pathologist, Dr. Diane Scala-Barnett, testified that after looking at Dr. Fazekas's autopsy body diagrams of Sister Pahl and at the original report of Sister Pahl's autopsy — which had been authored by Dr. Fazekas — it was her opinion that the strangulation that occurred in this case was not manual, by someone with "large hands," as had been initially suggested by Dr. Fazekas *Page 12 
prior to conducting the autopsy, but, rather, was more likely a soft ligature strangulation. Dr. Scala-Barnett observed that hands are never mentioned as the instruments of strangulation in the original autopsy report. Indeed, Dr. Fazekas's report, which describes numerous physical findings that suggest that Sister Pahl was strangled, contains no comment as to how the strangulation may have been accomplished. According to Dr. Scala-Barnett, when the method of strangulation is found to be hands, the term "manual strangulation" is generally specified in the autopsy report.
 {¶ 32} That Dr. Fazekas had likely abandoned her initial notion that the strangulation was manual and had been perpetrated by someone with big hands can also be found in an April 14, 1980 police report containing a subsequent opinion by Fazekas that the crime could have been committed by either a man or a woman.
 {¶ 33} When discussing a cluster of six stab wounds to Sister Pahl's face, Dr. Scala-Barnett noted that Dr. Fazekas had described the wounds as having edges that were "sharp." According to Dr. Scala-Barnett, the fact that the edges were sharp ruled out scissors as the murder weapon, because scissors, which have one blunt edge and one sharp edge, would leave a different kind of pattern. She added that scissors would also leave an abrasion where the blunt side entered the skin, and that no such abrasions were described in Dr. Fazekas's report. *Page 13 
 {¶ 34} According to Dr. Scala-Barnett, variations in the appearance of Sister Pahl's wounds were due to the lines of cleavage in her skin and the different angles at which the weapon was inserted.
 {¶ 35} On February 27, 2004, Det. Cousino examined the letter opener together with the altar cloth to determine whether any of the bloodstains on the cloth were consistent with the weapon. He found several stains that he thought were consistent with the curve and shape of the letter opener, including the blade, the ribbed handle and the handle's decorative knob.
 {¶ 36} Det. Cousino also examined the puncture defects in the altar cloth. He discovered among the stab marks in the portion of the altar cloth that had covered Sister Pahl's chest, nine precisely aligned stab marks that marked the outline of an upside down cross.[7] Det. Cousino testified that the puncture marks had an unusual Y-shape that was consistent with the size and shape of the letter opener's unique four-sided blade.
 {¶ 37} He stated that a cross-section of the four-sided blade would show a diamond or kite shape, and he described the blade itself as one that starts from a point and gets progressively wider up to the handle. Speaking to the unique nature of the blade, Cousino testified that he had searched for letter openers with similar blades by looking online, contacting letter opener collectors, and taking books out from the library. After *Page 14 
looking at pictures of thousands of letter openers, he never found one even similar to the letter opener in question.
 {¶ 38} In March 2004, Det. Cousino performed a third presumptive test for blood, this time using the chemical luminol. He applied the chemical to the portion of the letter opener where the medallion had been affixed, and got a "very tiny" positive reaction.
 {¶ 39} That same month, Toledo police brought the altar cloth and letter opener to forensic scientist T. Paulette Sutton, an expert on bloodstain pattern analysis. At trial, Sutton testified that the letter opener was consistent with being the object that created eight separate patterns on the altar cloth. She testified that one stain in particular was consistent in size and shape with the U.S. Capitol depiction on the letter opener's medallion. When asked whether another object could have made the same mark, she answered, "If another object made it, it would have had to have been basically the same shape, the same size, and the same configuration. So if there's another object like that, sure."
 {¶ 40} Sutton also testified regarding a circular bloodstain on Sister Pahl's forehead that can be seen in the post-mortem photographs. After measuring the stain and comparing it with the letter opener, Sutton determined that the forehead stain was consistent, in size and shape, with a raised circular surface located near the letter opener's hilt. *Page 15 
 {¶ 41} On April 23, 2004, at approximately 3:30 p.m., investigator Ross and Sgt. Forrester went to appellant's home to interview appellant and conduct a search of his premises. They arrived in an unmarked car, and parked in appellant's driveway. The officers, wearing plainclothes, knocked on the door. When appellant answered, the officers identified themselves as investigators with the cold case squad and presented appellant with a business card. They then indicated to appellant that they wanted to question him about certain statements that appellant had made to police in 1980 in connection with the investigation of the death of Sister Pahl.
 {¶ 42} Appellant invited the officers into his residence and offered them seats in the living room. The officers interviewed appellant in the living room for 45 — 60 minutes. Thereafter, Ross indicated to appellant that he wanted to show him a number of photographs. Appellant suggested that the kitchen table would be a good place to do that. Ross accompanied appellant to the kitchen table. There, he displayed the photographs and continued the interview with appellant for an additional 15 — 30 minutes.
 {¶ 43} During the questioning, appellant told the investigators that when he had arrived at the sacristy on the day of the murder, Father Swiatecki had looked at him and said, "You killed her. Why did you kill her?" Appellant stated that he made no response to this allegation.
 {¶ 44} Appellant also stated that he had never loaned the letter opener to anyone, that he had never cut himself with it and that he had always locked his apartment door. *Page 16 
 {¶ 45} In addition, appellant claimed that he never had a key to the sacristy because he had no reason to go into this room. Sgt. Forrester stated that, as a Catholic and former altar boy himself, he found it curious that appellant would not have reason to go into the sacristy. According to Sgt. Forrester, the sacristy is where the priest changes and gets ready for mass. At the conclusion of the interview, appellant was arrested and, days later, the indictment was returned.
 {¶ 46} On May 20, 2004, Sister Pahl's body was exhumed. A second autopsy was performed, this time by Dr. Scala-Barnett, and a DNA standard was extracted. Several days later, anthropologist Julie Saul examined a piece of Sister Pahl's mandible and found that it contained a small, diamond-shaped defect. From this examination, Saul was able to discern that the tip of the weapon that caused the defect had a point; that the weapon had to be fairly sturdy in order to puncture the hard, dense bone of the mandible; and that the weapon had a "rounded flattened diamond shape at the tip cross section."
 {¶ 47} On June 7, 2004, Det. Cousino brought the letter opener to the Lucas County Coroner's office. Dr. Scala-Barnett and Julie Saul compared the weapon to the defect in Sister Pahl's mandible, and concluded that they were consistent with one another. Next, with Det. Cousino, Sgt. Forrester, investigator Ross, and prosecutor Tim Braun all in attendance, they inserted the tip of the letter opener into the defect. According to Dr. Scala-Barnett, "it was a perfect fit," and, in her opinion, the letter opener, or a weapon exactly like it, caused Sister Pahl's injuries. *Page 17 
 {¶ 48} Saul confirmed Dr. Scala-Barnett's findings, stating that when the blade was placed into the defect, "it just seemed to lock in place". Saul also testified that the blade fit "quite well" in a defect found in the victim's sternum and was also "very consistent with" a puncture found in the victim's cervical vertebra.
 {¶ 49} During the state's rebuttal, Dr. Scala-Barnett demonstrated to the jury the different wound patterns that would be caused by the letter opener as compared to a pair of scissors. She did this by placing the end of the letter opener in one disk of clay and by placing the end of a pair of scissors in another. She indicated to the jury that where the letter opener was placed in clay, all of the edges in the clay were sharp, "like a little diamond." Where a pair of scissors was placed in clay, however, there was a sharp edge and a square edge, with the square edge resulting from the dull, non-cutting part of the scissors.
 {¶ 50} In August 2004, the state contacted forensic scientist Henry Lee, Ph.D. to obtain a reconstruction of the crime scene. Dr. Lee reviewed photographs, crime scene reports, and the medical examiner's report. He also made a personal inspection of the Mercy Hospital chapel and various items of evidence, including the altar cloth. Among Dr. Lee's conclusions was that, at the time of the attack, Sister Pahl was likely disabled or knocked down pretty quickly on the floor, and then, without much of a struggle, she was stabbed. He also concluded, based on a relative absence of blood that could be seen in the photographs, that there may have been an additional cause of death involved besides *Page 18 
stabbing. Finally, he opined that following the stabbing, the body and face had been moved, and that the crime scene could have been staged by the assailant.
 {¶ 51} Dr. Lee also testified about blood transfer patterns. He spoke in particular about the same altar cloth stain that was singled out for discussion by forensic scientist Sutton. Dr. Lee described the stain as having a rectangular component and a semicircular component — "like a medallion type of a pattern." When he compared the stain to the letter opener's medallion, he determined that the two were consistent, and that the medallion could not be excluded as the object that made the stain.
 {¶ 52} In response to the entirety of the state's expert blood transfer evidence and testimony, defense counsel John Thebes, with tracing paper, rendered his own tracing of one of the bloodstains on the altar cloth. Forensic scientist Sutton acknowledged on cross-examination that the tracing resembled a pair of scissors.
 {¶ 53} In January 2005, forensic anthropologist Steven Symes, Ph.D., an expert on bone trauma analysis, examined, photographed and measured the letter opener and the piece of Sister Pahl's mandible that contained the diamond-shaped defect. He also made lightweight, hard plastic casts of the two articles. When he inserted the cast of the letter opener into the cast of the defect, he found that the letter opener slipped in and fit very well. Symes testified that his tests indicated that the mandible defect was created by a tool similar in size and shape to the letter opener. *Page 19 
 {¶ 54} Symes noted that, as a class project, he and some students had tested close to ten different kinds of scissors — including medical scissors, secretarial scissors, and office scissors — in balsa wood. The scissors were tested at different depths, in open and closed positions, but none of the scissors made a defect similar to the one found in Sister Pahl's mandible.
 {¶ 55} In response to the state's expert bone trauma evidence and testimony, appellant introduced his own expert testimony by anthropologist Kathleen Reichs, Ph.D. Dr. Reichs testified that in conducting her analysis, she had examined various photographic images and reviewed various reports, including a supplemental crime report by Det. Marx, Dr. Fazekas's coroner's report, a laboratory report by Daniel Davison, a report of exhumation and second autopsy by Diana Scala-Barnett, a report of skeletal analysis by Julie Saul and Frank Saul, and a report of osteological examination by Steven Symes. Of note is that Dr. Reichs never examined the mandible bone itself.
 {¶ 56} As a result of her analysis, Dr. Reichs concluded that the test fit of the letter opener into the mandible defect potentially could have done something to alter the bone defect. But she could not say with any degree of scientific certainty that the test fit did, in fact, alter the bone defect.
 {¶ 57} Part of the state's efforts to glean information in this case included the use of DNA testing. In July 2004, BCI forensic scientist Agosti performed STR and PCR DNA analysis on Sister Pahl's underwear and on the altar cloth. Agosti detected a *Page 20 
mixture of DNA on the underwear. She identified Sister Pahl as one contributor to the mixture. She stated that another contributor to the mixture had to be a male, but the sample showing that result was so small as to be below reporting standards.
 {¶ 58} Agosti also detected a mixture on the altar cloth, with Sister Pahl being one contributor to the mixture. That result was later changed, in August 2005, by BCI forensic scientist Elizabeth Benzinger. The change was made to reflect a new way that DNA was being interpreted. According to Benzinger, what Agosti had recorded as two DNA alleles "actually represented background noise and were not true DNA types." Therefore, following the new interpretation, the only DNA type that was found on the altar cloth was one consistent with Sister Pahl.
 {¶ 59} Agosti compared the samples from the underwear and altar cloth to a standard for appellant. With respect to all of those samples, appellant was excluded as being a contributor.
 {¶ 60} In 2005, BCI forensic scientist Gehres performed RT PCR DNA testing on three additional samples from the altar cloth. As to two of the samples, she got a partial type, and as to the third sample she got no result. She testified that although she would normally expect to get full profiles with the amount of DNA that was quantitated, the fact that she got only partial profiles was due to the degraded condition of the DNA. She further testified that when she compared the DNA profiles from the altar cloth to a standard from Sister Pahl, she found no DNA type foreign to Sister Pahl. *Page 21 
 {¶ 61} Gehres next obtained and tested DNA standards for every person the state could locate who had had contact with the evidence or who had been in the sacristy with the victim. Among the standards tested was one for Father Swiatecki. Gehres compared each of the standards to the male DNA obtained from Sister Pahl's underwear. None was a match.
 {¶ 62} Also in 2005, the state commissioned DNA experts from a company called ReliaGene Technology to conduct Y-chromosome testing of fingernail clippings that had been taken from Sister Pahl's body. The clippings were swabbed and tested for the presence of blood, and at least one of them tested positive. The blood was not appellant's. A small amount of DNA was extracted from the clippings. As with the blood, the DNA was excluded as being appellant's.
 {¶ 63} In addition to the scientific evidence, the state provided eyewitness evidence to establish its case. Eyewitness evidence going to the timing of events was as follows. Sister Pahl was last seen alive at approximately 6:50 a.m., on April 5, 1980, when ambulance driver Jerry Tressler passed her in a hospital hallway.[8] *Page 22 
 {¶ 64} At approximately 7:00 a.m., hospital security guard Robert Wodarski noticed that the chapel doors were open, and the light was on. Minutes later, Nursing Supervisor Rose Byers observed that the chapel doors were locked.[9]
 {¶ 65} At some time between 7:15 a.m. and 7:30 a.m. that morning, Sister Madelyn Marie Gordon entered the hospital chapel. She said her morning prayers, and then went to work arranging music for the afternoon service. After 8:00 a.m., she went to the sacristy to use the telephone. Using her key, she unlocked the sacristy door and entered the room. There, she discovered the lifeless body of Sister Pahl. Sister Gordon's screams were heard by EKG technician Leslie Kerner sometime between 8:00 and 8:15 a.m.
 {¶ 66} Appellant's alibi, throughout the proceedings, was that on the morning of April 5, 1980, until after the body was discovered, he had been in his living quarters. At trial, the testimony of several hospital employees conflicted with this account of appellant's whereabouts.
 {¶ 67} Leslie Kerner testified that she had been working at Mercy Hospital for several years prior to April 1980 and had seen appellant almost daily. She recalled that on April 5, 1980, she arrived at work between 6:50 and 7:00 a.m., as was her habit and *Page 23 
routine. She further recalled that, as she was walking to her office after clocking in to work that day, she observed appellant, wearing dark clothing, by the doors of the chapel.
 {¶ 68} Kerner testified that when police first interviewed her, in April 1980, they asked her if she had seen anything unusual on the day of the murder. Because she did not think there was anything unusual about appellant being present at the chapel at 7:00 a.m., she answered that she had not. She did, however, tell her then fianc É (and at the time of trial, ex-husband), Richard Kerner, that she had seen a priest near the chapel.[10] In 2005, after having watched a televised story about Sister Pahl's unsolved murder, Leslie Kerner called the Lucas County Prosecutor's Office to let authorities know all that she had seen that day.
 {¶ 69} Grace Jones was employed by Mercy Hospital on April 5, 1980, and worked in the lab. She stated that she saw appellant at the chapel doors at some time after 7:00 a.m., but before Sister Pahl's body was found. At the time she saw appellant, Jones was in the hallway near the chapel, where she had gone to get a newspaper. Jones testified that while waiting for the elevator in the hallway, she saw appellant come out of the door to the chapel. She testified that appellant walked by her and that they nodded to each other. She said that at the time of the encounter, appellant was wearing a black robe and a small cap, and was carrying a dark colored bag. Her best recollection as to the time *Page 24 
that she saw appellant was about 30 minutes after her co-worker, John Teems, got off work. John Teems' shift was from 11:00 p.m. to 7:00 a.m.[11]
 {¶ 70} There was also testimony by Dr. Jack Baron, who had been the chief resident at Mercy Hospital on April 5, 1980. According to Dr. Baron, while he was running to the chapel in response to the emergency call for aid to Sister Pahl, he passed an individual dressed as a priest, who appeared to be between 35 and 45 years of age, was 57" — 5'8" tall, with a medium build and dark hair. While Dr. Baron did not identify this person to be appellant, he did testify that it was not the other priest, Father Swiatecki, whom he knew quite well. Father Swiatecki weighed between 250-260 pounds. Appellant, in 1980, was in his early 40's, was 57" tall, weighed 160-165 pounds, and had dark hair.
 {¶ 71} Wardell Langston, the janitor who, in 1980, had spoken to police about hearing frantic footsteps at about 7:30 a.m. on the day of the murder, testified at trial that the sound of the footsteps — that came from the hallway connecting to the chapel, then made their way around the balcony to another hallway, at the end of which was appellant's residence — was loud, and made him think that something was wrong. The *Page 25 
residence toward which the footsteps were heard to go was the same place that appellant claimed to have been until after Sister Pahl's murder.[12]
 {¶ 72} Other testimony contradicted appellant's statements to police that he had no key to the sacristy door and that he had no reason to go into the sacristy. Sister Phyllis Ann Gerold and Sister Gordon both testified that appellant, as a priest, would have had his own key to the sacristy. When Sister Gordon was asked why the priests would have keys to the sacristy, she answered, "They often have to go in there, and if maybe somebody would want communion outside of the normal times, or to check on most anything, they would have to have access to it."
 {¶ 73} In 2004, appellant repeatedly described his actions after being informed of Sister Pahl's death as quickly dressing from his morning shower and then "running" to the chapel.[13] However, when confronted with statements by witnesses who said that they heard the sounds of running footsteps in appellant's hallway on the morning of the *Page 26 
murder before Sister Pahl's body was discovered, appellant changed his story to say he could not have run, due to the length of his cassock.
 {¶ 74} Because appellant's letter opener was determined to be the murder weapon, access to appellant's personal residence became a factor. In 2004, appellant tried to convince police that he kept his door unlocked and that anyone could have entered his residence. He later conceded that, in fact, he kept his apartment locked.
 {¶ 75} As indicated above, 71-year old Sister Pahl was found in a state of near nudity. Her overgarments had been pulled up to her chest, and her undergarments had been pulled down to and off of one foot. Yet, investigators found no evidence of semen and the victim's hymen was intact — although the autopsy did note an abrasion to the victim's labium and hymen.
 {¶ 76} Sister Pahl's body had been placed so that her legs were straight and together, her arms were by her sides, and her head was straight and looking up. Nine stab marks were evenly placed in the shape of a cross on the altar cloth — so evenly, in fact, that Det. Cousino believed the assailant had likely used some kind of a template while inflicting them. In addition, the victim had a smear of blood on her forehead, between her eyes, yet there was no wound or scratch to her forehead to account for this blood.
 {¶ 77} Investigators had concluded there was no robbery, and it was likely that the assailant and victim were not strangers to one another. *Page 27 
 {¶ 78} In an effort to determine whether any of these facts and other circumstances at the scene had relevant significance, investigators contacted Father Jeffrey Grob of the Chicago Archdiocese. Father Grob testified that he was employed by the Archdiocese of Chicago as an associate vicar for canonical services. As such, he was the principal point of contact for the 317 parishes in the diocese in regard to questions involving church law. He was also involved in the field of providing imprimaturs, the Catholic Church's seal of approval for books. He further indicated that he was a trained canon lawyer as well as a judge on the diocesan court of appeals. Additionally, Father Grob was the assistant to the exorcist for the Archdiocese of Chicago. As such, he was the first point of contact for anyone who might call regarding the occult or other related matter.
 {¶ 79} Father Grob testified that he was familiar with the rituals of the Catholic Church as well as other rituals not of Catholic origin. It was Father Grob's opinion that Sister Pahl's killer would have to have been someone with specialized knowledge of Catholic ritual, such as a religious sister, a seminarian, or a priest. Father Grob opined that much of what occurred to the victim was an attempt to mock and degrade her. He based his opinion on several facts in evidence from the crime scene, including the finding of an inverted cross punctured upon the altar cloth which had covered the victim; that the victim was covered with an altar cloth prior to any stabbing; that her forehead was anointed or marked with blood; that there was indication of some vaginal penetration; *Page 28 
and that all of this occurred in the presence of the Eucharist, which Catholics believe is the actual body of Christ.
 {¶ 80} At the time of the homicide, everyone in the hospital with relevant religious knowledge was accounted for, except for appellant.[14]
 {¶ 81} Statements by appellant, himself, established that he may have been less than content working with the nuns at Mercy Hospital. Sister Gordon testified that appellant had twice expressed a desire to be a military chaplain, and that such desire was never fulfilled. In addition, appellant — the hospital's Senior Chaplain — in his taped interview with police, referred to Mercy as "their [the nuns'] hospital."
 {¶ 82} Evidence about Sister Pahl's demeanor and personality was also presented. She was variously described by witnesses as a "perfectionist," and as one who could be "very, very strict," "very stern." "Things had to be done a certain way;" if not, "[t]hen she would come and tell you." She did not hesitate to state her opinions. Appellant described Sister Pahl as having a dominant personality.
 {¶ 83} Shirley Lucas, the housekeeper who had met with Sister Pahl on the Good Friday before her death, testified as follows regarding the details of that encounter. On April 4, 1980, Lucas met with Sister Pahl in the chapel to get the key to clean the *Page 29 
convent. When Sister Paul gave Lucas the key, she stated that she was waiting to speak to "Father" about the changes he wanted to make for Easter Services. After her cleaning duties were finished, Lucas returned the key to Sister Pahl. It was at that point that Sister Pahl, literally in tears, cried, "Why do they cheat God out of what belongs to Him?" Lucas did not know which of the two priests Sister Pahl had been referring to.[15] The next morning, Sister Pahl was found dead in the chapel sacristy.
 {¶ 84} During the state's closing arguments, the state made a suggestion to the jury, based on the evidence, as to why the crime might have occurred.[16] Specifically, the state argued:
 {¶ 85} "You listened to this evidence. You heard what took place in the sacristy. Is this some sort of satanic cult killing? No. Was this part of some ritualistic black mass? No. Sorry to disappoint. This case is about perhaps the most common scenario there is for a homicide. A man got very angry at a woman, and the woman died. The only thing different is the man wore a white collar, and the woman wore a habit."
 {¶ 86} In describing the ritualized nature of the attack, the state argued that appellant, after choking Sister Pahl to the brink of death, performed last rites:
 {¶ 87} "What do you do over the dead or dying? You perform last rites. And that's what he did. Oh, a bastardized version of last rights to be sure, but that is what *Page 30 
happens. He covers her with that blessed altar cloth, and he marks her with the sign of the cross, but an upside down cross. Why? Father Grob told us why. To degrade her. To mock her. To humiliate her. To bring her down to the lowest point he possibly could. He marks her with an upside down cross in front of the Eucharist, the very person of Jesus Christ to whom she is wed. He carves that in her. Does that make him a Satanist? No. It she'd have been Jewish, he would have carved a Swastika in her chest. It was how he could humiliate her most.
 {¶ 88} "And then is he done after that? No. No. There's more to do. What can we do? Well, you have to anoint her. What would be the worst possible way? What would be the most offensive way to do that? Well, with blood, her own blood. So he pulls off that altar cloth and he stabs her to get her blood.
 {¶ 89} "* * *
 {¶ 90} "Well, that should be enough, shouldn't it? Isn't that enough humiliation for one murder? No. It's not enough. We have to do more. What else can we do? We'll strip her. We'll strip her naked, that's what we'll do. We'll roll up that smock. We'll take that girdle down. We'll leave her naked in front of the Blessed Sacrament. Is that enough? No. Even that is not enough. And we know that he does more. Imagine what it took to pull that girdle down off a dead body. Why is he doing all that? Notice this picture. Notice that the girdle is actually off her left foot. Her shoe is still on. But for *Page 31 
some reason he struggles to get it off and free up that leg so it wouldn't be bound together to the other one.
 {¶ 91} "Why would he do that? Well, for the final act of the degradation, the final act of humiliation. He needs to free that leg. He needs access, cause he wants to penetrate her. With the blade? With the crucifix? With his finger? We don't know. It doesn't matter. But he does it, and we know because in the autopsy report you will find that this virginal nun had a red scratch inside her.
 {¶ 92} "And so he finishes, and he straightens up her body. Just like Phyllis Ann said, it looked posed to her. People don't die straight like that. And he stands up, and he looks at his work, and what is it that he has left there on the floor? He's left a message to Sister Margaret Ann Pahl? To be sure. Maybe to the church. Maybe to God himself. See how angry I am. See what you have made me do. This is how angry I am. He left a message for everyone to see."
 {¶ 93} At the beginning of the rebuttal portion of the state's closing argument, the state commented — apparently in response to defense counsel's closing argument that one of the blood stains on the altar cloth could have come from a nickel because "a picture of Congress" is on the back of a nickel — "[I]f you see [defense counsel] John Thebes on the street, do not take a nickel from him because the Capitol Building is not on the back of a nickel. The Monticello is." Thebes countered this comment by joking, "I only have dollar bills." *Page 32 
 {¶ 94} Also during the rebuttal portion of the state's closing argument, the state commented on the relevance of the DNA evidence in the case. The state began by pointing out that the amount of DNA that had been available for testing in this case was merely "trace," and that back in 1980 — when DNA testing was not yet available — precautions were not taken at crime scenes to protect trace DNA evidence against contamination by those who were investigating the scene.
 {¶ 95} Next, the state highlighted the fact that the DNA that was available for testing in this case was highly degraded after 24 years and, thus, was of poor quality. Summing up its assessment of the value of the DNA evidence in this case, the state argued:
 {¶ 96} "So in every case when you have DNA evidence, and it is powerful if you have it in enough quantity and if the context is correct, it can be very powerful evidence. But in this case, I don't think it proves or disproves anything. In fact, if it turned out, let's say, for argument's sake that it did come back to Father or Gerald Robinson, if it came back as his DNA, his argument would be the same thing I'm telling you right now, is that this is trace. He was in that sacristy on numerous occasions, and he actually went down there at some point then during the course of the day, that his DNA could have gotten on her by him just standing over her. So, if both sides can make that argument, it's basically a wash because it doesn't prove or disprove anything. *Page 33 
 {¶ 97} "But we have a situation with a homicide crime scene is more than 26 years ago today. But when we get the DNA testing was 24 years ago, they did not take the precautions necessary at that point in time because DNA didn't exist. They didn't even know that you can actually get trace amounts of DNA to where they protected the crime scene. They didn't know it at the coroner's office. They didn't know it at the labs. Nobody knew to take the adequate precautions to protect scenes so they are not contaminated and that there is actually legitimate evidence that can actually tie the DNA to the crime scene.
 {¶ 98} "And I have the definition up here of relevancy that we deal with as lawyers is that, `relevant evidence means any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' This is just not relevant evidence. It doesn't prove it either way. Doesn't help the defense. It doesn't help the State. It's because it's such a small amount it literally could have come from anywhere."
 {¶ 99} After summarizing the expert forensic testimony that had been presented by the state to show that the letter opener was the weapon in this case, the state remarked upon defense counsel's attempt to show that it was not the letter opener, but a pair of scissors that caused Sister Pahl's injuries:
 {¶ 100} "It can't be the scissors. The image on the altar cloth just above the hand guard is inconsistent with scissors, the distance between the scissors and the thumb *Page 34 
guard, and what I'm going to do is — Mr. Thebes' drawing has no basis in scientific theory. He just decided to trace the letter opener. There's no science behind what he did, and something that maybe a third-grade class could do to say we have the stain, could you make it look like scissors. But just looking at this, you could determine it can't be scissors. Because if he's saying that this area, the absence of blood in that particular area is a pin that's there, it renders this unable to be scissors. Let me demonstrate for you. The whole concept with scissors is that they're fulcrums. They have to be able to go like this. If you see these scissors, you can see where the fulcrum is and how the distance it is from the handle. It's got to be a certain distance away from it. If you take this circle area here, it's too close to the handle. It would not be able to open the scissors based upon this. So there's no validity to this little test that he did with his little comparison that he made and it probably ought to go back to a third-grade class where it belongs."
 {¶ 101} At one point, the State, while addressing the testimony of defense expert Kathleen Reichs, Ph.D., showed the jury a chart that referred to her as a "hired gun." In discussing her testimony, the state provided:
 {¶ 102} "Then they called Kathy Reichs to testify. And her testimony was pretty poor. She talked about she had sort of two personalities. She had Katherine Reichs, Ph.D., that she's the forensic anthropologist, and when she's the novelist, she's Kathy Reichs. Well, I think we just heard the testimony of Kathy because she did absolutely no science. I think the telling point was what Dr. Barnett talked about, is that scientists do *Page 35 
not presume, and that's exactly what she did. She never examined anything. She never did anything. They talk about trust. Would you go to a doctor that would not even look at you? She didn't look at the evidence. They talk about that they weren't at the exhumation. * * * They talk about they were not allowed to go to the exhumation. The evidence from the exhumation is still at the coroner's office. It's always been there available for review. She's refused to review the evidence. First and only time she's ever testified from photographs was in this court. Nowhere else. Clearly improper. Unethical. Never conferred with the experts who actually did the testing. She knows those people. She didn't say, well, how did you do this, what test did you conduct? I mean, she's not in a situation where they're adverse parties. We're here for a search for the truth and she could've explained a lot to you, but she decided not to be able to do that for you. And her opinion is based upon the term of could have. And she failed to follow her own replication and protocol. She did nothing. So I don't think she really adds anything to this particular case."
 {¶ 103} The state's final closing words were as follows:
 {¶ 104} "Mr. Mandross talked about in opening statements that you can't not talk about God and religion in this particular case because you have a Catholic priest and a nun involved in this. But this is a court of law, and the laws that apply here are the laws of man. Gerald Robinson may be judged by some other authority at a later date, but the *Page 36 
focus of — the focus of judgment — but this is focus of judgment of man's law, and he's up for judgment today with you.
 {¶ 105} "Based upon man's law, the State of Ohio has proven its case beyond a reasonable doubt. I submit to you that your verdict of guilty will finally bring justice to the bride of Christ, Sister Margaret Ann Pahl."
 {¶ 106} At the end of appellant's trial, on May 11, 2006, the jury returned a unanimous verdict of guilty on the amended charge of murder.
 {¶ 107} Appellant filed a timely appeal of his conviction, raising the following assignments of error:
 {¶ 108} "THE 24-YEAR PRE-ACCUSATION DELAY IN THE COMMENCEMENT OF THIS ACTION DEPRIVED APPELLANT OF DUE PROCESS OF LAW UNDER THE OHIO AND UNITED STATES CONSTITUTIONS BECAUSE APPELLANT SUFFERED ACTUAL SUBSTANTIAL PREJUDICE AND THE STATE OF OHIO'S DELAY IN THE PROSECUTION WAS UNJUSTIFIED."
 {¶ 109} "APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE OHIO AND UNITED STATES CONSTITUTIONS WHEN COUNSEL INEXPLICABLY FAILED TO COMPETENTLY ARTICULATE THE MOST CRITICAL LEGAL ISSUE PRESENTED BY THE FACTS OF THIS CASE IN PRE-TRIAL MOTION PRACTICE." *Page 37 
 {¶ 110} "THE STATE OF OHIO'S INJECTION OF `SATANISM' INTO THE CRIMINAL PROCESS EVISCERATED APPELLANT'S RIGHT TO A FAIR TRIAL UNDER THE OHIO AND UNITED STATES CONSTITUTIONS."
 {¶ 111} "THE JURY'S FINDING ON THE ELEMENT OF IDENTITY WAS CONTRARY TO THE MANIFEST WEIGHT OF THE CREDIBLE EVIDENCE PRESENTED."
 {¶ 112} "APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE OHIO AND UNITED STATES CONSTITUTIONS THROUGHOUT THE COURSE OF HIS TRIAL."
 {¶ 113} "APPELLANT'S RIGHT TO A FAIR TRIAL UNDER THE OHIO AND UNITED STATES CONSTITUTIONS WAS COMPROMISED BY PREJUDICIAL PROSECUTORIAL OVERREACHING AND MISCONDUCT."
 {¶ 114} "THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS HIS 2004 STATEMENTS."
 {¶ 115} "WHEN VIEWED CUMULATIVELY, THE OTHERWISE HARMLESS ERRORS COMMITTED BELOW DEPRIVED APPELLANT OF DUE PROCESS OF LAW AND A FAIR TRIAL."
 {¶ 116} Appellant, in his first assignment of error, argues that the 24 year delay between the commission of the offense and the bringing of the indictment in this case *Page 38 
resulted in substantial actual prejudice to appellant and was unjustified by the state, thereby depriving appellant of his right to due process.
 {¶ 117} Appellee, noting that appellant has raised this argument for the first time on appeal, states that because appellant did not raise the argument at the trial court, the issue has been waived and is not properly before this court. Although "[a]n appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court," State v. Williams (1977), 51 Ohio St.2d 112, 117, we find that appellant's argument should be afforded our full review on appeal, not just because it raises a fundamental constitutional issue, but also because the issue raised forms the basis for appellant's claim of ineffective assistance of counsel.
 {¶ 118} Turning to the merits of appellant's argument, we note that an unjustifiable preindictment delay that results in actual prejudice to a defendant "violates those `fundamental conceptions of justice which lie at the base of our civil and political institutions,' * * * and which define `the community's sense of fair play and decency' * * *", and, thus, effectively deprives a defendant of his right to due process of law under Section 16, Article I of the Ohio Constitution and the Fifth
and Fourteenth Amendments to the United States Constitution. State v.Luck (1984), 15 Ohio St.3d 150, 159, paragraph two of the syllabus;United States v. Lovasco (1977), 431 U.S. 783, 790 (citations omitted); see, also, State v. Lewis, 4th Dist. No. 00CA10, 2001-Ohio-2496. *Page 39 
 {¶ 119} To determine whether an indictment should be dismissed as a result of a preindictment delay, the Supreme Court of Ohio, in State v.Luck, supra, adopted a test first used by the United State Supreme Court in United States v. Lovasco, supra, and United States v. Marion (1971),404 U.S. 307. That test, as set forth in Luck, supra, is as follows:
 {¶ 120} The defendant must first demonstrate that the delay caused actual prejudice to his defense. Id, at 157-158. Once the defendant makes this showing of actual prejudice, the burden then shifts to the state to prove that the reasons for the delay were justifiable. Id., at 158. The court then views the prejudice suffered by the defendant in light of the state's reason for the delay in order to make a determination as to whether the delay resulted in a violation of the defendant's due process rights. Id., at 154.
 {¶ 121} To prove actual prejudice, a defendant must show, by concrete proof, the exculpatory value of any alleged missing evidence. See,State v. Gulley (Dec. 20, 1999), 12th Dist. No. CA99-02-004, citingUnited States v. Doerr (C.A.7, 1989), 886 F.2d 944, 964; State v.Lewis, supra, citing State v. Flickinger (Jan 19, 1999), 4th Dist. No. 98CA09; see, also, State v. Brown, (Mar. 17, 2000), 4th Dist. No. 98CA25, citing United States v. Marion, supra. In other words, a defendant must show how lost witnesses and physical evidence would have proven the defendant's asserted defense. See State v. Gulley, supra;State v. Davis, 7th Dist. No. 05 MA 235, 2007-Ohio-7216, ¶ 17 ("Without proof of prejudice, meaning something which adversely affects [a defendant's] ability to *Page 40 
defend himself at trial, there is no due process violation for preindictment delay in prosecution."). A showing based on mere speculation will not be found sufficient. See State v. Gulley, supra;State v. Brown, supra. In addition, "[prejudice will not be found due to the lack of non-exculpatory evidence." State v. Gulley, supra.[17]
 {¶ 122} The court, in deciding whether the prejudice that is established by a defendant constitutes "actual prejudice," must balance the claimed prejudice against the remaining evidence in the case, including any newly discovered evidence, to determine whether the missing evidence would have minimized or eliminated the impact of the state's evidence. See State v. Luck, 15 Ohio St.3d. at 154, 157; see, also, State v. Brown, supra. Ultimately, the determination of whether there has been "actual prejudice" involves "a delicate judgment based on the circumstances of each case." United States v. Marion (1971),404 U.S. at 325; State v. McClutchen, 8th Dist. No. 81821, 2003-Ohio-4802, ¶ 11.
 {¶ 123} If the defendant fails to meet his burden of establishing actual prejudice — that is, if the court determines that the missing evidence would not have significantly minimized or eliminated the impact of the state's evidence — the inquiry ends and the matter is concluded. If, however, the defendant meets his burden of establishing actual *Page 41 
prejudice, the court must go on to determine whether there was any justifiable reason for the delay in prosecution that caused the prejudice. State v. Luck, 15 Ohio St.3d. at 158.
 {¶ 124} According to the court in Luck, "[A] delay in the commencement of prosecution can be found to be unjustifiable when the state's reason for the delay is to intentionally gain a tactical advantage over the defendant * * * or when the state, through negligence or error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased." Id. The court additionally noted that "[t]he length of delay will normally be the key factor in determining whether a delay caused by negligence or error in judgment is justifiable." Id.
 {¶ 125} If the court, upon viewing the prejudice suffered by the defendant in light of the state's reason for the preindictment delay, finds that the delay was unjustifiable and has resulted in actual prejudice to the defendant, such that he has been deprived of his due process rights, the indictment against the defendant will be dismissed. See Luck, supra. In making this determination, a court should bear in mind "some prejudice" to a defendant occurring from evidence lost over the years does not deprive him of due process; rather, in order for a defendant to be deprived of due process, the prejudice must be substantial. See State v. Walls, 96 Ohio St.3d 437, 2002-Ohio-5059,¶ 56; Lovasco, 431 U.S. at 796 ("To prosecute a defendant following investigative delay does not *Page 42 
deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.")
 {¶ 126} In the instant case, appellant claims that he was prejudiced as a result of the death of several "key" defense witnesses. To establish a claim of prejudice due to the unavailability of witnesses who would be able to testify on a defendant's behalf, the defendant must identify the missing witnesses and the subject matter of their testimony, and, further, must explain how the missing evidence has impaired his defense. See State v. McClutchen, supra, at ¶ 13.
 {¶ 127} Among the witnesses whose passing appellant claims to have been prejudiced by were Dr. Renate Fazekas and Dr. Steven Fazekas. Dr. Renate Fazekas performed the initial autopsy of Sister Pahl, and authored the attendant autopsy report. Dr. Steven Fazekas, who was Renate Fazekas' husband, attended the autopsy, but had no other involvement in the investigation.
 {¶ 128} Appellant's claim that the death of Steven Fazekas somehow prejudiced his defense clearly amounts to nothing more than mere speculation, and merits no additional consideration in this analysis. We note that "[t]he death of a witness alone is insufficient to establish actual prejudice arising from pre-indictment delay." State v.Peoples, 10th Dist. No. 02AP-945, 2003-Ohio-4680, ¶ 30.
 {¶ 129} Regarding Dr. Renate Fazekas (hereinafter "Dr. Fazekas"), it is appellant's contention that her unavailability to testify as a defense witness at trial prevented *Page 43 
appellant from developing defense theories that: (1) appellant could not have strangled Sister Pahl because, allegedly according to Dr. Fazekas, the murderer had "large hands" and appellant does not; and (2) the murder weapon, instead of being appellant's letter opener, was likely a pair of scissors that was discovered missing from the sacristy on the day of the murder.
 {¶ 130} The state contends that appellant's ability to advance the above-stated theories was not in the least impeded by the unavailability of Dr. Fazekas, because Dr. Fazekas' autopsy report and all police reports relating to appellant's theories were introduced into evidence and used by the defense to advance its claim that appellant was innocent. The state further contends that "the reality of what Dr. Fazekas expressed corroborates the State's evidence and not the defense's theory."
 {¶ 131} In support of his position that the murderer had "large hands," appellant introduced a police report, from the day of the murder, of a brief interview of Dr. Fazekas by Det. Marx. According to the report, Dr. Fazekas was of the opinion that Sister Pahl was
 {¶ 132} "* * * strangled from behind by an individual with large hands. This was the doctor's opinion due to the fact that a rather large bruise was noticed on the back neck. The doctor did state that the cause of death could not be determined until after complete autopsy. An autopsy would be scheduled for the following morning." *Page 44 
 {¶ 133} As indicated above, Dr. Fazekas' report of Sister Pahl's autopsy made no mention of manual strangulation or of "large hands."
 {¶ 134} Dr. Scala-Barnett, who conducted the second autopsy of Sister Pahl, was of the opinion that Sister Pahl was the victim of ligature, rather than manual, strangulation. Contrary to appellant's claim, Dr. Scala-Barnett did not "impeach" any autopsy findings of Dr. Fazekas, because Dr. Fazekas made no official finding of manual strangulation. As noted above, Dr. Fazekas stated after she had performed the autopsy that the murder could have been committed by either a man or a woman. Thus, Dr. Fazekas' testimony would not necessarily have exculpated appellant.
 {¶ 135} In considering appellant's argument that the murderer used a pair of scissors, rather than appellant's letter opener, we recall that in 1980, after the scissors were reported missing from the sacristy, Sister Mary provided police with a sample pair of scissors that were similar to the missing pair. Police then showed the sample pair of scissors to Dr. Fazekas to get her opinion as to whether scissors could have been the murder weapon. The "missing" scissors were never recovered and the sample scissors were only intended to be a reasonable approximation of what the "missing" pair might have looked like. The sample scissors were not retained by police, but a tracing of them was made and, at the request of the defense, was later introduced into evidence at trial. Sister Mary indicated to police that the "missing" scissors were about one inch longer and slightly wider than the sample. *Page 45 
 {¶ 136} The shorter and slightly narrower scissors were inspected by Dr. Fazekas a couple of weeks after the murder. According to the police report, Dr. Fazekas, based upon her examination of skin samples and photographs of Sister Pahl, felt that the sample scissors "could very well have been the weapon, but would not say it with 100 percent certainty." She also stated that some of the punctures on the body appeared to have been made with the scissors closed and some with the scissors open, and that the neck wounds appeared to have been made with the scissors open. She additionally stated that the wounds of the victim's face appeared to have been made with a weapon that was sharper than the scissors.
 {¶ 137} Several days after she examined the sample pair of scissors, Dr. Fazekas examined appellant's letter opener. According to the police report, "Dr. Fazekas measured the instrument and compared the instrument as to depth of wound and to width of blade. Her conclusion was that the instrument was compatible with each of the wounds found in the body and could have been the weapon used."
 {¶ 138} In support of his position that a pair of scissors was the murder weapon, appellant points to various measurements that Dr. Fazekas had taken of Sister Pahl's wounds. According to appellant, the measurements coincided more closely with the dimensions of the missing scissors than with appellant's letter opener.
 {¶ 139} In response to this argument, the state points out that, in fact, the wound measurements are not completely consistent with the dimensions of either the letter *Page 46 
opener or the sample scissors (again, the actual "missing scissors" were never recovered), and that this phenomenon was explained by Dr. Scala-Barnett as resulting from lines of cleavage on the skin, which can affect the apparent width and depth of wounds on a body, depending upon how the line of cleavage is penetrated by a stab wound.
 {¶ 140} As before, appellant's suggestion that Dr. Scala-Barnett somehow "impeached" Dr. Fazekas' autopsy findings is inaccurate, because Dr. Fazekas made no official finding that a pair of scissors was the murder weapon.
 {¶ 141} To the extent that appellant claims that he was unfairly and substantially prejudiced because he was unable to cross-examine Dr. Fazekas in connection with various "inculpatory" statements — including that there appeared to have been no rape; that the perpetrator may have been trying to mislead investigators into thinking there had been a rape; and that appellant's souvenir sword could have been the weapon used — we note that appellant himself argued in favor of the admission of old police reports that contained these statements. Any confrontation rights relating to the admission of these reports was knowingly, intelligently, and voluntarily waived by appellant at trial. See footnote 1, supra. Moreover, under the circumstances of this case, where Dr. Fazekas' "inculpatory" statements were corroborated by abundant other evidence, we conclude that the benefit to appellant of any cross-examination of Dr. Fazekas with respect to these statements is speculative, at best. *Page 47 
 {¶ 142} In light of the foregoing, we find that appellant did not establish, by concrete proof, the exculpatory value that testimony by Dr. Renate Fazekas or Dr. Steven Fazekas would have had. See, State v.Gulley, supra; State v. Lewis, supra.
 {¶ 143} Next, appellant complains that he was prejudiced because police reports that summarized oral statements he had made to police during his 1980 interviews were lost. First, appellant suggests that incriminating statements alleged to have been made by him in 1980 might not be in the reports, in which case the testimony of detectives would be impeached. However, the only truly incriminating statements made by appellant in 1980 consisted of his claim that had received a confession to the murder from someone, followed by his denial that such a confession had occurred. Contrary to appellant's suggestion, these statements were, in fact, memorialized and did survive in a polygraph examination request form that had been filled out by Det. Marx in 1980. In addition, in 2004, appellant himself confirmed that he made those statements.
 {¶ 144} Appellant claims that, in addition to the statements concerning the alleged confession, statements concerning appellant's alibi were likewise incriminating. At trial, Lt. Weigand testified that appellant had stated to him in 1980 that at the time he received the news of Sister Pahl's death, he was just finishing getting dressed. In 2004, however, appellant told police that when he received the news of Sister Pahl's death, he was dripping wet from his morning shower.[18]
Appellant also considered incriminating Lt. *Page 48 
Weigand's recollection at trial that, in 1980, appellant had stated that Sister Pahl had a "dominating personality."[19] Regarding these so-called incriminating statements, we find appellant has not shown, other than by speculation, that the missing notes are exculpatory. Instead, appellant seeks the missing notes to attack the credibility of police witness accounts. As indicated above, "[prejudice will not be found due to the lack of non-exculpatory evidence." State v.Gulley, supra.
 {¶ 145} Appellant additionally alleges that he might have made exculpatory statements in 1980 which, in the absence of the police reports, he was unable to bring out at trial, thereby depriving him of: (1) any opportunity to demonstrate to the jury that the version of the events that he gave to police in 1980 was consistent with the version he gave in his 2004 videotaped statements; and (2) the ability to effectively cross-examine the police witnesses who had conducted the interviews. Regarding the alleged inability to cross-examine police witnesses, in particular, appellant complained that "the investigators could only remember the incriminating details."
 {¶ 146} The state, in response to this argument, points out that the detectives who interviewed appellant in 1980 freely conceded that he denied the murder. Appellant fails *Page 49 
to suggest in any way what additional exculpatory statements he might have made or how they would be admissible. In response to appellant's complaint that the investigators could only remember the incriminating details of their interviews with appellant, we once again note that "[prejudice will not be found due to the lack of non-exculpatory evidence." State v. Gulley, supra.
 {¶ 147} Finally, appellant argues that appellant's lost statements were critical to his trial preparation, in particular to his decision as to whether he should take the stand in his own defense. Specifically, appellant complains:
 {¶ 148} "Appellant's original statements to police occurred in 1980 and they were lost. Twenty-four years later, during trial, the State used those uncorroborated oral statements against him."
 {¶ 149} However, appellant makes no suggestion that prior knowledge of the so-called uncorroborated oral statements would have changed his decision not to take the stand.
 {¶ 150} Based on all of the foregoing, we find that appellant did not establish, by concrete proof, the exculpatory value of the missing 1980 police reports. See, State v. Gulley, supra; State v. Lewis, supra.
 {¶ 151} Next, we consider the impact that the death of Father Swiatecki and the loss of his 1980 statements had on this case. Appellant argues that he was prejudiced by these occurrences for two reasons. First, appellant claims that there was evidence *Page 410 
pointing to the fact that Swiatecki, rather than appellant, committed the murder. Specifically, appellant claims that, as a Catholic priest, Swiatecki fit the state's profile of the murderer and, as a big man, he fit Dr. Fazekas' initial impression that the victim had been strangled by someone with "large hands." Also, appellant claims that because it was Swiatecki who was the conducted the April 4, 1980 Good Friday services, it was he with whom the victim was angry, thereby providing him with a motive to kill.
 {¶ 152} Second, appellant claims that Swiatecki's death and the loss of his 1980 statements prevented appellant's lawyers from questioning Swiatecki on his alibi between 7:30 a.m. and 7:50 a.m. on April 5, 1980.
 {¶ 153} As indicated in the facts above, Dr. Fazekas' initial impression about the assailant having had "large hands" was followed by her impression that the murder could have been committed by a man or a woman, and by Dr. Scala-Barnett's opinion that the strangulation was a ligature, not manual strangulation.
 {¶ 154} Regarding the issue of which of the two hospital priests had upset Sister Pahl on the day before her death, we note that although it is true that Swiatecki was the celebrant at the April 4, 1980 Good Friday services, the jury may just as well have concluded, based on the evidence that was presented, that appellant, as the Senior Chaplain at the hospital, was the one who planned the changes to the Easter services.
 {¶ 155} More important, perhaps, is that Father Swiatecki was eliminated as a potential suspect early on in the investigation because several nuns had confirmed his *Page 51 
presence in the cafeteria at the time of the murder. In response to this fact, appellant states that there is evidence in the record indicating that the time frame during which the murder occurred is longer than the state suggests and could have extended beyond 7:30 a.m., thereby leaving the possibility that Swiatecki did not have an alibi during the crucial time. In support of this allegation, appellant points to a police report memorializing an interview of witness Margaret Warren — who, as indicated above, was also deceased at the time of trial — wherein she stated that she heard "frantic footsteps" "leading away from the crime scene at 7:50 a.m." In fact, that report indicates that Warren heard footsteps at 8:50 a.m., and that she heard the footsteps, not just leading away from the chapel, but also leading up to the area of appellant's room. As mentioned earlier, an inconsistency between the time that was recorded on Warren's time card and the time that was recorded in the police report as the time that Warren got to work on April 5, 1980, created ambiguity as to when, in fact, Warren heard the footsteps. See, footnote 4. From that ambiguity, the jury was free to conclude, as appellant suggests, that Warren heard the footsteps at 7:50.
 {¶ 156} Even assuming, arguendo, that Warren, had she been available to testify at trial, would have testified that she heard someone fleeing the crime scene at 7:50 a.m., rather than 8:50 a.m., and thus, as appellant states, "left open the possibility that Father Swiatecki, rather than appellant, was the murderer," such would not have contradicted the testimony of Wardell Langston, who said he heard the footsteps at approximately 7:30 *Page 52 
a.m., and testimony by Sister Gordon, who stated that she had seen Father Swiatecki in the cafeteria at approximately 7:30 a.m. and that she had gone to the hospital chapel immediately after, where she remained until after 8:00 a.m., when she discovered Sister Pahl's body. In addition, any testimony by Warren that she heard footsteps at 7:50 a.m. would not necessarily have exculpated appellant. For these reasons, we find that any prejudice to appellant that was caused by Warren's death was speculative, at best, and therefore insufficient to establish actual prejudice. See State v. Gulley, supra; State v. Brown, supra.
 {¶ 157} In the instant case, the evidence tended to show not that Swiatecki was guilty or that he was motivated by a desire to hide his own involvement in the murder — as is suggested by appellant — but rather that Swiatecki believed that appellant was guilty. Appellant, in his 2004 interview with police, himself admitted that Father Swiatecki, while kneeling before the victim's body, accused appellant of killing Sister Pahl. There was no evidence to suggest that this information was supplied to the police back in 1980 or that Father Swiatecki sought to implicate appellant to authorities in any way, let alone that Swiatecki was motivated by a desire to hide his own involvement. Because the evidence indicated that Swiatecki believed that appellant was guilty, Swiatecki's testimony explaining his reasons for this belief would have been helpful to the prosecution, not the appellant. *Page 53 
 {¶ 158} In arguing that Father Swiatecki's unavailability at trial prevented the defense from calling him to develop the theory that Father Swiatecki, not the appellant, was the true murderer, appellant does nothing more than speculate as to how the testimony of Father Swiatecki would have been helpful to his defense. Similarly, he fails to indicate how the police report of Father Swiatecki's 1980 interview would have been in any way exculpatory. Accordingly, we find that appellant did not establish, by concrete proof, the exculpatory value that testimony by Father Swiatecki would have had; nor did he establish the exculpatory value of the missing report of Father Swiatecki's 1980 police interview. See State v. Gulley, supra; State v. Lewis, supra.
 {¶ 159} Appellant raises in his initial brief, but appears to abandon in his reply brief, an argument concerning "at least" two deceased — and unnamed — witnesses who allegedly saw a "suspicious black male in close proximity to the crime scene, at or about the time of death, and right where one of the bloody altar cloths was found." As pointed out by the state, the only testimony at trial about anyone other than appellant being seen alone on the same floor as the chapel came from Sister Gordon who related seeing a person of very small stature (i.e., no "large hands") in a corridor near the planning office at some time between 7:05 and 7:10 a.m. on the morning of the murder. The man was in a hurry, and Sister Gordon thought he was late for work. She did not recall her statement to police in 1980, but she did not think that this individual was black. Moreover, this person was not seen "in close proximity to the crime scene * * * and right where one of *Page 54 
the bloody altar cloths was found", but, in fact, was spotted at the opposite end of the main hallway leading from the chapel doors and around another hallway by a room known as the planning office. On the basis of the foregoing, we find that appellant's claims about deceased witnesses who allegedly saw a suspicious black man in close proximity to the chapel are unsupported by the evidence and are completely speculative. Accordingly, they will be given no additional consideration by this court.
 {¶ 160} Finally, appellant claims that that he was prejudiced by the fact that the state lost the sample pair of scissors that was examined by Dr. Fazekas in this case. As emphasized above, the "missing" scissors were never recovered and the sample scissors were only meant to be a reasonable approximation of what the "missing pair" would have looked like. Also, although the sample scissors themselves were not retained, a tracing of them was made, introduced into evidence, and shown to the jury. Appellant argues that without the sample scissors, he was unable to present expert testimony to corroborate Dr. Fazekas' initial finding that a pair of scissors could have been the murder weapon. Inasmuch as the sample scissors were just that, sample scissors, and not the actual scissors discovered missing from the sacristy, we find that appellant has failed to show, by concrete proof, the exculpatory value of the missing evidence. State v. Gulley, supra; State v. Lewis, supra.
 {¶ 161} In determining whether appellant has sustained his burden to demonstrate "actual prejudice," it is necessary to consider the strength of the state's case, because a *Page 55 
compelling case will require a higher level of prejudice to warrant dismissal of the indictment. See Luck, supra, at 154, 157;Brown, supra. As indicated infra, in our analysis of appellant's fourth assignment of error concerning the weight of the evidence in this case, the evidence of appellant's guilt — including evidence showing that he was the person who committed the murder and that the instrument that he used to commit the murder was his sword-shaped letter opener — was very strong. And, in light of that evidence, we are compelled to conclude that any small amount of prejudice that may arguably have been suffered by appellant as the result of the missing evidence (and based upon our analysis above, we do not find that there was any such prejudice) did not constitute "actual prejudice." In this case, the lost witnesses and physical evidence would not have proved appellant's asserted defenses, and the missing evidence would not necessarily have exculpated appellant. Instead, the missing evidence went to the credibility of the state's evidence, which was a matter best left for trial. See State v.Gulley, supra.
 {¶ 162} Because appellant has failed to meet his burden of establishing actual prejudice, we need not consider whether there was any justifiable reason for the delay in the prosecution in this case. In addition, because the issue of preindictment delay was not raised in the trial court, the state never had an opportunity to present evidence on the subject. For these reasons, we decline to examine the merits of this aspect of appellant's *Page 56 
claim. And for all of the foregoing reasons, appellant's first assignment of error is found not well-taken.
 {¶ 163} Appellant argues in his second assignment of error that he was denied effective assistance of counsel because his trial counsel failed to file a motion to dismiss the indictment based upon the 24-year-long preindictment delay.
 {¶ 164} In order for a defendant to obtain a reversal of a conviction or sentence based on ineffective assistance of counsel, he must prove "(a) deficient performance (`errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by theSixth Amendment') and (b) prejudice (`errors * * * so serious as to deprive the defendant of a fair trial, a trial whose result is reliable')."State v. Adams, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 30, citingStrickland v. Washington (1984), 466 U.S. 668, 687.
 {¶ 165} In evaluating appellant's claim of ineffective assistance of counsel, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id., at ¶ 31, citing Strickland, supra, at 689. In addition, we are mindful that "[t]rial counsel cannot be second-guessed as to trial strategy decisions." Id.
 {¶ 166} Appellant's trial counsel strategy appears to have hinged on the notion that evidence that was missing in the case resulted primarily in an evidentiary problem, rather than a due process problem. Evidence of this strategy can be found in trial counsels' *Page 57 
pretrial attempts to compel the production of missing evidence relating to appellant's 1980 police interviews, and in trial counsels' argument at trial wherein they sought to have admitted into evidence as "ancient documents" various other police reports from 1980.
 {¶ 167} On appeal, appellant objects to his trial counsels' strategy, stating that the focus of the strategy should have been not on the evidentiary problem raised by the missing evidence, but rather on the due process problem arising from the 24-year-long preindictment delay.
 {¶ 168} We find that under the circumstances of this case, trial counsels' performance was skillful, and their strategy, sound. We reach this conclusion, in part, because, without the admission of statements contained in the old police reports, appellant would have had virtually no evidence with which to counter the state's evidence. With those statements, however — in particular, those by Dr. Fazekas concerning an assailant with "large hands" and the possibility that a pair of scissors had been the murder weapon — appellant had at least some basis upon which to argue his alternative theories respecting the killer's identity and the identity of the weapon that was used.
 {¶ 169} Moreover, as we indicated in our discussion of appellant's first assignment of error, appellant did not suffer actual prejudice as a result of the preindictment delay, and, therefore, any pretrial motion to dismiss the indictment based on that delay would *Page 58 
properly have been denied by the trial court. The law is well-settled that "[c]ounsel is not required to file a meritless motion simply for the sake of placing it on the record to avoid a charge of ineffective counsel." State v. Davenport (Oct. 25, 2000), 9th Dist. Nos. 19419, 19420.
 {¶ 170} On the basis of the foregoing, we find that trial counsel's failure to file a motion to dismiss the indictment based in the 24-year-long preindictment delay did not constitute error. We further find that it did not result in prejudice to appellant.
 {¶ 171} "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley (1989),42 Ohio St.3d 136, paragraph three of the syllabus.
 {¶ 172} Although the introduction of the old police reports may arguably have had the unwanted effect of emphasizing the lack of actual prejudice suffered by appellant due to the preindictment delay, there is no evidence or allegation to suggest that the introduction of the reports did anything to change the outcome in this case. Stated otherwise, we find that even without the information contained in the old police reports, appellant's claims of actual prejudice are no less unsupported than they were with the information; as such, those claims remain insufficient to establish a due process violation. *Page 59 
 {¶ 173} As appellant has failed to establish either error on the part of his counsel or prejudice arising from his counsels' performance, appellant's second assignment of error is found not well-taken.
 {¶ 174} Appellant argues in his third assignment of error that the state violated appellant's right to a fair trial by injecting "Satanism" into the criminal process, through the testimony by Father Grob. Upon our review of Father Grob's testimony, we find that, contrary to appellant's claim, the focus of that testimony was not on "Satanism," but rather on efforts that were made by the killer to degrade and humiliate the victim.
 {¶ 175} Prior to trial, Father Grob was subpoenaed to testify at a hearing held in February 2006. The purpose of the hearing was to have the court determine the qualifications of various experts that the prosecution intended to call and the admissibility of the experts' testimony. At the last moment, appellant did not want to have a hearing concerning the admissibility of Father Grob's testimony. Instead, the parties entered into a written agreement wherein it was specified that if the state laid the proper factual foundation, Father Grob could testify as to the following: (1) his opinion that the perpetrator had a high level of knowledge of the Catholic religion; (2) his opinion that the facts and circumstances of the homicide indicated a conscious design by the perpetrator to mock or degrade the Catholic religion; (3) his opinion that the facts of the case indicated that some type of ritual or ceremony was conducted over the victim's body; and *Page 510 
(4) his opinion that appellant risked disciplinary action by the Catholic Church, up to and including excommunication, by his comments to Det. Marx about the alleged confession.
 {¶ 176} At trial, Father Grob was called and questioned regarding his credentials to testify as an expert witness. Pursuant to Evid. R. 702, a witness who is qualified as an expert by specialized knowledge, skill, experience, training, or education may testify as to matters beyond the knowledge and experience possessed by lay persons. Father Grob was qualified and accepted by the court as an expert in the fields of Catholicism and rituals. The subject matter of his testimony clearly related to matters beyond the understanding and experience of most jurors.
 {¶ 177} At trial, Father Grob explained the Catholic rituals concerning Easter. He referred to the three days preceding Easter Sunday as the Paschal Triduum. On Holy Thursday, the first day of the triduum, the focus of the evening service is on the Last Supper, the meal at which Catholics believe that Christ created the Eucharist by blessing bread and wine and turning them into his body and blood. Father Grob explained that the Eucharist, also referred to as the consecrated Host, Holy Communion, or the Blessed Sacrament, is central to the Catholic religion. At the end of the Holy Thursday service, the Eucharist is removed from the tabernacle on the altar of the church or chapel and placed in a repository in the sacristy.
 {¶ 178} On Good Friday, the focus of the service is on Christ's crucifixion and veneration of the cross. At the end of the service, the altar is stripped bare as a means of *Page 61 
emphasizing Christ's death on the cross. On Holy Saturday, there is only an evening service.
 {¶ 179} Applying this information to the data relating to the crime scene at Mercy Hospital, Father Grob found that it was significant that the murderer chose the sacristy rather than the chapel as the site of the murder because that was the place where the Eucharist had been kept since the Holy Thursday service. He indicated that Sister Pahl was a nun, and, as such, a bride of Christ. He viewed the fact that she had been stripped naked from her shoulders to her feet, the fact that her forehead had been marked with blood, the manner in which she had been posed, and the fact that she had been covered with an altar cloth and stabbed through it nine times in the shape of an inverted cross as indicators that this was a ritualized murder in which the perpetrator sought to mock and degrade Sister Pahl, God, and the Catholic Church. And, based on his experience and training, he believed that the murderer had to have specialized knowledge of Catholic rituals for the crime to have been committed in the manner it was.
 {¶ 180} Appellant argues that Father Grob's testimony amounted to prejudicial "profiling" testimony. We disagree. In the instant case, Father Grob was not requested to engage in criminal "profiling," nor did he attempt to do so. Criminal profiling is the attempt to link the general characteristics of a unique kind of crime, such as a serial murder, to the specific characteristics of the defendant. Simmons v.State (Ala.Crim.App. 1999), 797 So.2d 1134, 1150. "Such evidence is of little probative value and [is] *Page 62 
extremely prejudicial to the defendant since he is, in a sense, being accused by a witness who was not present at any of the crimes." Id.
 {¶ 181} Father Grob's testimony, on the other hand, centered on his opinion of what the crime scene and the physical condition of the victim's body suggested happened during the murder — not unlike the testimony of an expert in the field accident reconstruction. See id., at 1151. There is an enormous difference between testimony identifying a person who bears certain characteristics as being more likely to have committed an offense and testimony indicating that the physical evidence of a crime reveals certain characteristics about the offense. See id. Father Grob's testimony had nothing to do with "profiling" within the meaning of the term as used by appellant. This crime involved a Catholic nun who was killed in the sacristy of a Catholic chapel in a Catholic hospital on Holy Saturday. The murderer clearly performed some kind of rituals as part of the slaying, and that was all that father Grob testified about.
 {¶ 182} Father Grob used the term "Satanic" only four times during his entire examination. His first use of the term was nothing more than a harmless reference to his duties as an assistant to the exorcist for the diocese of Chicago.
 {¶ 183} The second use occurred when he was explaining his doctoral thesis on exorcism. There he stated:
 {¶ 184} "[A] person can't write on the rite or the ritual of exorcism, be it the ancient or the revised, without having to study a whole background of practices of things *Page 63 
that people do. Again, you fall into the realm of Satanism, satanic worship, you can go into Tarot cards, you can go into horoscopes, you can go into any number of things, but anything that is not focused on the divine, on God, other gods with a small G and quotation marks, it would be an area of study."
 {¶ 185} Again, the use of the term was wholly innocuous within this context.
 {¶ 186} The third use of the term occurred when Father Grob was discussing the degrading manner in which Sister Pahl's body had been displayed in the sacristy. He was discussing the term "mockery reversal," and he merely pointed out that such conduct frequently occurs in "* * * any kind of ritual abuse, particularly satanic ritual abuse."
 {¶ 187} His final use of the term occurred when he was discussing the significance of an inverted or upside down cross. Father Grob explained that an inverted cross was first associated with the death of St. Peter. Father Grob went on to explain that "* * * [unfortunately, for many centuries now, that image has been usurped and is used in satanic worship as an effrontery, again, to the sacred."
 {¶ 188} Although it is appellant's contention that the state sought to stereotype him as an Antichrist and to establish that there was a satanic motivation in Sister Pahl's murder, the record clearly demonstrates that Father Grob never testified that Sister Pahl's murder was "satanic". He never described appellant as a "Satanist". When asked to explain what he believed the photographs and descriptions of the crime scene meant to *Page 64 
him as a priest, he expressed his opinion primarily in terms of the murder being a mockery of Sister Pahl's life of devotion to Christ.
 {¶ 189} The state's theory of the case was not, as appellant claims, that there was a satanic motive for the homicide. The assistant prosecutors never used such a term until closing argument, when the state specifically argued that what occurred was clearly not satanic. Father Grob's testimony was not offered in an attempt to prove the motivation for the murder. The testimony was offered to explain certain unusual circumstances which surrounded the crime scene that were beyond the knowledge and experience of the trier of fact. Appellant's third assignment of error is found not well-taken.
 {¶ 190} Appellant argues in his fourth assignment of error that the jury's finding on the element of identity was contrary to the manifest weight of the evidence. This court has articulated the applicable standard of review as follows:
 {¶ 191} "Our function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. State v. Thompkins (1997), 78 Ohio St.3d 380, 387,1997-Ohio-52. Under this standard, this court sits as a "thirteenth juror" and reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. Id., citing State v. Martin (1983), 20 Ohio App.3d 172, 175. If we decide that the fact finder clearly lost its way, we must reverse the conviction and order a new trial. Id. *Page 65 
 {¶ 192} "Nevertheless, we will not reverse a conviction so long as the state presented substantial evidence for a reasonable trier of fact to conclude that all of the essential elements of the offense were established beyond a reasonable doubt. State v. Getsy,84 Ohio St.3d 180, 193-194, 1998-Ohio-533. Moreover, we must keep in mind that the credibility of the witnesses who testified at trial is chiefly a matter to be determined by the trier of fact. State v. McDermott, 6th Dist. No. L-03-1110, 2005-Ohio-2095, ¶ 25, quoting State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus." State v. Terry, 6th Dist. No. L-06-1298, 2007-Ohio-4088, ¶ 12-13.
 {¶ 193} In the instant case, the state provided ample evidence at trial for the jury to conclude that appellant was the perpetrator of the homicide. That evidence was as follows. On April 5, 1980, at 8:15 a.m., Sister Gordon discovered the mutilated body of Sister Margaret Ann Pahl in the sacristy of the Mercy Hospital chapel. April 5, 1980 was Holy Saturday, the day before Easter.
 {¶ 194} The victim was last seen alive at approximately 6:50 a.m. The hospital chapel was continuously occupied by Sister Gordon from approximately 7:30 a.m. until 8:15 a.m., when she discovered Sister Pahl's body. Thus, the homicide occurred sometime after 6:50 a.m., but before approximately 7:30 a.m.
 {¶ 195} Appellant has always maintained that, on the morning in question, he remained in his living quarters — which were situated down the hallway from the chapel — until after Sister Pahl's body was discovered. *Page 66 
 {¶ 196} Contradicting appellant's story was testimony by other hospital employees who stated that they had seen appellant directly outside the chapel doors, both shortly before and shortly after the time of the murder.
 {¶ 197} Other evidence that pointed to appellant as the perpetrator was his uniquely-shaped letter opener and the fact that it left its "fingerprint" in the victim's blood on the altar cloth that covered the victim's body and, further, it perfectly fit her wounds.
 {¶ 198} In addition, there was evidence that appellant lied to police, both in 1980 and 2004. In 1980, appellant told police that the "killer" had confessed to him. When pressed, however, appellant admitted to making the story up to protect himself.
 {¶ 199} In 2004, appellant told police that he could not have gotten into the locked sacristy because he had no key to the door. Two nuns testified to the contrary, stating that appellant, as a priest, would have had his own key to the sacristy.
 {¶ 200} Also in 2004, appellant repeatedly stated that after being informed of Sister Pahl's death, he quickly dressed from his morning shower and then "ran" to the chapel. But when he was confronted with statements by witnesses who said they had heard the sounds of running footsteps in appellant's hallway on the morning of the murder prior to Sister Pahl's body being discovered, appellant changed his story to say that he could not have run, due to the length of his cassock.
 {¶ 201} Finally, in 2004, appellant changed his initial story to police that he had kept his door unlocked, ultimately conceding that he had kept his apartment locked. *Page 67 
 {¶ 202} The law is clear that lies told by an accused are admissible evidence of consciousness of guilt, and thus of guilt itself State v.Tressler, 6th Dist. No. WM-02-005, 2003-Ohio-1418, ¶ 42, citingState v. Eaton (1969), 19 Ohio St.2d 145, 160, vacated on other grounds (1972), 408 U.S. 935.
 {¶ 203} Also implicating appellant was his own statement to police that after Father Swiatecki had directly accused him of the murder, appellant offered no reply. This failure to deny Father Swiatecki's accusation could properly have been construed by the jury as an implicit admission of appellant's involvement in the homicide. See, State v.Alexander (Nov. 29, 1996), 11th Dist. No. 93-T-4948; State v.Hardison, 9th Dist. No. 23050, 2007-Ohio-366, ¶ 9; see, also, Evid. R. 801(D)(2)(b).
 {¶ 204} Additional evidence that implicated appellant as the perpetrator was the statement by Wardell Langston that shortly after 7:30 a.m., he heard the loud footsteps of someone running on the floor above him, coming down the hallway from the bridge that connected to the chapel and then making his or her way around the balcony above him to another connecting hallway that led to appellant's residence. It was in this residence that appellant claimed to have been at the time of Sister Pahl's murder.
 {¶ 205} Police had concluded that it was likely that the assailant and the victim were not strangers to one another. Testimony by Father Grob established that Sister Pahl's killer would have been someone with specialized knowledge of Catholic ritual, *Page 68 
such as a religious sister, a seminarian, or a priest. It was Father Grob's opinion that much of what the assailant did to the victim was an attempt to mock and degrade her.
 {¶ 206} At the time of the murder, everyone in the hospital who had relevant religious knowledge was accounted for, except for appellant.
 {¶ 207} Testimony by various witnesses suggested that appellant may not have been happy working with the nuns at the hospital, and that Sister Pahl, in particular, was very strict, stern, dominant, and opinionated.
 {¶ 208} Testimony by Shirley Lucas established that on the day before the murder, Sister Pahl had become very upset with one of the hospital priests after speaking to him about changes he wanted to make to Easter services. Lucas was unable to say which priest had upset the victim. Father Swiatecki was in the dining room at the time the murder occurred. Appellant, however, was seen at the chapel door — not once, but twice — within the time frame of the murder.
 {¶ 209} Based on all of the foregoing, we find that there was abundant substantial evidence upon which the jury could conclude that appellant was the person who killed Sister Pahl. The record contains no indication that the jury "lost its way" or "created a manifest miscarriage of justice." See State v. Terry, supra. Accordingly, appellant's fourth assignment of error is found not well-taken.
 {¶ 210} In his fifth assignment of error, appellant again argues that he was denied effective assistance of counsel. While his second assignment of error dealt with the *Page 69 
single matter of trial counsel's alleged ineffectiveness for failing to file a motion to dismiss the indictment, his fifth assignment of error recites a litany of other instances of alleged ineffectiveness.
 {¶ 211} First, appellant complains that "13 days into the trial, his counsel agreed that Father Jeffrey Grob could properly stereotype him as the perpetrator of this crime." In this regard, appellant cites the written stipulation wherein the parties agreed that, conditioned upon an appropriate factual foundation, Father Grob could give certain expert and opinion testimony.[20] Appellant argues that, rather than entering into the stipulation, trial counsel should have filed a motion in limine to exclude Father Grob's testimony.
 {¶ 212} In fact, appellant's defense team did file a motion in limine asking the trial court to prohibit testimony from Father Grob. As a result, a hearing was scheduled for February 16, 2006, to determine Father Grob's qualifications and the admissibility of his testimony as an expert. The hearing was ultimately determined to be unnecessary when, following an in-chambers discussion, the parties reached the aforementioned stipulation concerning Father Grob's testimony. That same day, counsel and appellant orally acknowledged their acceptance of the agreement on the record. The written stipulation was filed with the clerk of courts on April 28, 2006, several days before Father Grob testified. Thus, contrary to appellant's contention, the referenced stipulation, which was *Page 70 
initially entered into on February 16, 2006, was not entered into "13 days into appellant's trial."
 {¶ 213} On the face of the stipulation document is a notation stating that appellant was "advised by his attorneys as to the implications of the stipulation and agrees with his lawyers' counsel and advice that for trial strategy reasons the stipulation is in his best interest in terms of proceeding to the trial of the charges against him." As indicated above, the law is well settled that counsel's actions that might be considered trial strategy are presumed effective and should not be second-guessed by a reviewing court. State v. Adams, 103 Ohio St.3d. at ¶ 30. As the stipulation in this case was clearly a calculated trial tactic, we presume its effectiveness and, therefore, we decline to give the matter any additional consideration.[21]
 {¶ 214} By way of a footnote, appellant argues trial counsel should also have filed a motion in limine to exclude the testimony of the deputy coroner, Dr. Scala-Barnett. At trial, Dr. Scala-Barnett testified as follows regarding her qualifications. She stated that she had been a forensic pathologist employed as a deputy coroner with the Lucas County Coroner's Office since 1985. During that time she was also a clinical associate professor at the Medical College of Ohio/ Medical University of Ohio ("MUO"), teaching pathology and forensic pathology. Her education included four years of college, one year of graduate school, four years of medical school, four years of pathology training at *Page 71 
MUO, and one year of fellowship training in forensic pathology at the Cook County Medical Examiner's Office in Chicago. At the time of her testimony, she had previously performed a total of approximately 6,800 autopsies. Those included approximately 501 homicide cases. Of those, approximately 70 involved sharp force injuries and 35 involved strangulation. Dr. Scala-Barnett was board certified in pathology and forensic pathology and was licensed in two states, Ohio and Illinois. She was also a member of the American Academy of Forensic Sciences and the National Association of Medical Examiners.
 {¶ 215} Dr. Scala-Barnett was clearly qualified to testify as an expert in this case. Thus, any motion in limine concerning her testimony would have been denied. As was noted above, "[c]ounsel is not required to file a meritless motion simply for the sake of placing it on the record to avoid a charge of ineffective counsel." State v.Davenport, supra.
 {¶ 216} Appellant next suggests that trial counsel was ineffective for failing to request a jury instruction that, "* * *[in order] to find appellant guilty the jury had to exclude all inferences that might support a reasonable theory of innocence." Our review of the record reveals that — contrary to appellant's claim — trial counsel did, in fact, request such an instruction. The request was properly denied, however, because the proposed instruction does not correctly reflect Ohio law. In State v. Jenks (1992), 61 Ohio St.3d 259, the Ohio Supreme Court specifically held that, "* * * when the state *Page 72 
relies on circumstantial evidence to prove an element of the offense charged, there is no requirement that the evidence must be irreconcilable with any reasonable theory of innocence in order to support a conviction." Id., at 273. Based on the foregoing, we find that trial counsels' conduct with regard to the subject instruction was neither error nor prejudicial. See State v. Adams, supra, at¶ 30; see also, Strickland, supra, at 687.
 {¶ 217} Appellant next contends that trial counsel was ineffective for failing to request a jury instruction that a coroner's verdict is entitled to "presumptive evidentiary significance." In this regard, appellant suggests that the 1980 coroner's report contains "exculpatory facts" which the jury should have been instructed to presume were true. Appellant fails, however, to identify even a single fact that he considers "exculpatory".
 {¶ 218} In considering appellant's argument, we note that the state actually moved for admission of the 1980 coroner's report asinculpatory evidence of appellant's guilt. The state explains the significance of the report from its point of view as follows.
 {¶ 219} "The 1980 report was authored by former deputy coroner, Renata Fazekas. At trial, the 1980 report was referenced by deputy coroner Scala-Barnett, who described Dr. Fazekas as her `* * * mentor and * ** teacher.' The 1980 report concluded that `[t]his 71-year-old white female, Sister Margaret Ann Pahl, died of multiple, 31, stab wounds to the left side of the face, neck, and the chest. There also was evidence of strangulation.' Dr. Scala-Barnett testified that she performed a second autopsy in 2004. Her report is entitled to the same presumption as that of Dr. Fazekas concerning the cause of death *Page 73 
because she too is a deputy coroner. The procedure followed was very similar to the first autopsy, but she also collected DNA evidence in the piece of bone from the victim's jaw. She subsequently inserted the appellant's letter opener into the jawbone and found that it was `a perfect fit'. Based upon her experience, knowledge and training, Dr. Scala-Barnett concluded `* * * that this weapon caused these injuries or a weapon exactly like this caused the injuries.' Her report did not conflict with or contradict the 1980 coroner's report but supplemented it. Together the two reports established overwhelming evidence of the appellant's guilt." (Citations to the record omitted.)
 {¶ 220} Based upon the foregoing, we find that had trial counsel requested the subject jury instruction, it would have benefited the state of Ohio, and not appellant.
 {¶ 221} Even assuming, arguendo, that the 1980 report might have included arguably exculpatory information, it was plainly rebutted by competent, credible evidence to the contrary, through the testimony of Dr. Scala-Barnett and the other forensic experts who testified in this case. Vargo v. Travelers Ins. Co. (1987), 34 Ohio St.3d. 27, paragraph one of the syllabus (Holding that coroner's factual determinations regarding cause of decedent's death in coroner's report/death certificate create a "* * * non-binding, rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary."); see, also, Whitfield v. Bartek, 11th Dist. No. 2007-Ohio-0078, 2008-Ohio-1026, ¶ 33. We therefore find that any error in defense counsel's *Page 74 
failure to request the proposed jury instruction was harmless, and did not result in any prejudice to appellant. See Adams, supra, at ¶ 30;Strickland, supra, at 687.
 {¶ 222} Appellant next enumerates — in a single paragraph, and with little or no substantive discussion — six additional instances of alleged ineffective assistance. In the first, appellant complains that trial counsel failed to conduct effective cross-examination of the state's forensic witnesses. But, in making this complaint, appellant fails to provide any substantive argument in support of his position. Rather, in a footnote, he complains about the number of transcript pages devoted to cross-examination of the state's experts.
 {¶ 223} The argument that the effectiveness of cross-examination should be judged by the number of transcript pages that the cross-examination consumes is one that simply cannot succeed. As stated by the Supreme Court of Ohio in State v. Dixon (2004),101 Ohio St.3d 328, 2004-Ohio-1585, "The extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not constitute a lack of effective assistance of counsel." Id., at ¶ 54.
 {¶ 224} Appellant next claims — without any citation to authority or to the record — that his trial counsel erred by failing to file any motions regarding the propriety of the state's evidence. Our review of the record reveals that, contrary to appellant's contention, trial counsel sought to determine the admissibility of the testimony of several state witnesses by way of a "Motion in Limine and Request forDaubert Hearing." Among the witnesses whose testimony was challenged by this motion were Father Grob of the *Page 75 
Chicago Archdiocese, criminalist T. Paulette Sutton, and forensic anthropologist Steven Symes.
 {¶ 225} Appellant next complains — again, without citation to authority or to the record — that his trial counsel demonstrated an inability to cite applicable law during key in-chambers and bench conferences. Contrary to this conclusory allegation, we find that the defense team demonstrated a sophisticated knowledge of the law, both constitutional and evidentiary. An example of this high level of knowledge was manifested in the team's success in arguing for application of the "ancient documents" exception to the hearsay rule in order to gain admission of old police reports into evidence.
 {¶ 226} Next, appellant complains that the defense team called certain police officers to the stand in its case-in-chief. He claims that this was done for "no apparent tactical reason." To the contrary, the record reveals that the defense team called these witnesses for the purpose of impeaching key state witnesses and to attack the quality of the police work done in 1980.
 {¶ 227} The defense elicited testimony from Det. Forrester to challenge the credibility of witnesses Jack Baron, Leslie Kerner, and Grace Jones, each of whom had observed appellant in the vicinity of the chapel at the time of the murder. With this witness, the defense also challenged the adequacy of the 1980 police investigation.
 {¶ 228} Appellant called Det. Daniel Foster to further challenge the credibility of Jack Baron. *Page 76 
 {¶ 229} Through the testimony of Det. Weinbrecht, trial counsel challenged the credibility of Wardell Langston concerning the footsteps he reported hearing in the hallway leading to appellant's living quarters. Counsel also elicited testimony concerning a pair of scissors that counsel later argued was the murder weapon.
 {¶ 230} Also through Det. Weinbrecht, appellant presented testimony suggesting that footsteps heard by Margaret Warren at the time of the murder were not those of appellant. In addition, counsel was able to attack the accuracy of various police reports. Finally, appellant was able to elicit testimony that appellant had been referred to as a "very meek and mild type of individual."
 {¶ 231} Investigator Ross was initially called by the state in its case-in-chief. The defense recalled him in its case to elicit additional testimony supporting its argument that the footsteps heard by Margaret Warren were not appellant's. The defense also used Ross to lay an appropriate foundation for the admission of the smock that was removed from Sister Paul's body on the day of her autopsy.
 {¶ 232} Through Det. Marx, the defense attempted to impeach Leslie Kerner's trial testimony with a statement that she had provided to an investigator back in 1980. In the statement, Kerner had reported not having seen anything unusual on the day of the murder.
 {¶ 233} Testimony by Det. Marx further established that in 1980, student nurse Connie Schroeder had reported to police that she had been near the chapel doors at *Page 77 
around 7:00 a.m. on the day of the murder, and had observed at that time that the chapel doors were open. Such testimony arguably contradicted the trial testimony of witness Rose Byers, who testified that around 7:00 a.m. on the day in question, the chapel was locked.
 {¶ 234} Defense counsel likewise established that Mercy Hospital nun Sister Mary Alacoque had reported to police in 1980 that at approximately 7:00 or 7:15 a.m. on the day in question, she had traveled on the elevator near the chapel corridor, walked to the nuns' dining room, and had seen no one.
 {¶ 235} Through Det. Marx, defense counsel again challenged the sufficiency of the 1980 police investigation. Counsel elicited testimony which permitted the argument that police failed to preserve or collect evidence at the murder scene; that there were missing technicians' reports; and that police failed to do a complete job of testing for fingerprint evidence. Also from Det. Marx, defense counsel educed testimony concerning missing police reports.
 {¶ 236} These witnesses were essential to appellant's strategy to diminish the testimony of state witnesses and to attack the initial police work done on this case. With the exceptions of Det. Forrester and investigator Ross, the defense was forced to call all of these witnesses because the state did not use them in its case-in-chief. In closing argument, defense counsel actually used this fact to appellant's advantage, arguing that the state did not call Det. Marx "[b]ecause the investigation was so poor, and that's *Page 78 
important in terms of evaluating this case." Trial counsel's decision to call these witnesses was a matter of sound trial strategy. See State v.Adams, supra, at ¶ 31.
 {¶ 237} Next, appellant argues that trial counsel was ineffective for failing to renew a motion for judgment of acquittal at the close of the evidence. In evaluating this claim, we note that trial counsel did, in fact, make a motion for acquittal at the close of the state's case, and that it was denied by the trial court. A motion for judgment of acquittal pursuant to Crim. R. 29 should be denied "if the evidence, viewed in the light most favorable to the government, is such that `a reasonable mind might fairly find guilt beyond a reasonable doubt.'"State v. Bridgeman (1978), 55 Ohio St.2d 261, 263; State v. Catlett
(July 24, 1981), 6th Dist. No. L-80-312. In light of the overwhelming evidence of appellant's guilt, it must be concluded that appellant's motion for acquittal was properly denied. And if trial counsel had renewed the motion at the end of the defense's case, it likewise would have been properly denied. Accordingly, we find that appellant, in making this claim, has failed to establish a claim for ineffective assistance. See State v. Adams, 103 Ohio St.3d 508, supra, at ¶ 30;Strickland, supra, at 687; see, also, State v. Davenport, supra, (holding that "[c]ounsel is not required to file a meritless motion simply for the sake of placing it on the record to avoid a charge of ineffective assistance of counsel").
 {¶ 238} Finally, appellant claims the trial counsel did not appreciate the exculpatory nature of "crucial physical and forensic evidence in this case." He describes *Page 79 
the so-called "crucial evidence" in a footnote. In a conclusory fashion and without citation to the record, appellant asserts that the letter opener measures "3/8 inches in width at 1 1/2 inches from its tip," and, that, based on this measurement, the letter opener is incompatible with Dr. Fazekas' finding as to the facial wounds. We do not find these measurements in the record. Even if they were in the record (and we make no finding that they are), appellant fails to identify how they would be inconsistent with any information contained in Dr. Fazekas' report.
 {¶ 239} Appellant then claims that the letter opener blade varies in width "between 1 1/2 and 3 inches from its tip," and that, based on this measurement, the letter opener is incompatible with Dr. Fazekas' findings as to the characteristics of the murder weapon. Again, appellant fails to identify any specific inconsistency.
 {¶ 240} Appellant asserts that defense counsel was ineffective for failing to make these arguments concerning the alleged incompatibilities to the jury.
 {¶ 241} In a similar manner — and, again, without citation to the record — appellant asserts that "the sample scissors had blades that were 3 inches in length (compatible with the deepest stab wounds to the victim's neck and chest) and one-half (1/2) inch in width at that length (compatible with all of the deepest stab wounds to the victim's neck and chest)." While appellate counsel presents these as matters of "fact," we do not find that they appear in the record. *Page 80 
 {¶ 242} Although there apparently was a pair of scissors missing from the room in which the victim was murdered, the record is void as to the exact length the blades of those scissors. The only reference in the record is to a tracing of a pair of similar scissors that were both narrower and about an inch shorter than the pair of scissors that was thought to be missing.
 {¶ 243} In spite of the foregoing, appellant argues that counsel was ineffective for failing to argue that the missing scissors were the murder weapon. In fact, much of the defense's closing argument was dedicated to the proposition that the murder weapon was a pair of scissors, and not the letter opener.
 {¶ 244} Moreover, "it is well established that if demonstrating ineffective assistance of counsel requires proof outside the record, then such claim is not properly raised in a direct appeal." State v.Baker, 7th Dist. No. 03 CO 24, 2003-Ohio-7008, ¶ 16. Because appellant's argument concerning defense counsels' alleged failure "to appreciate the crucial physical and forensic evidence in this case" depends upon proof outside the record, we find that it is not properly before us in this appeal and, therefore, warrants no additional consideration herein. See id.
 {¶ 245} Even assuming the propriety of appellant's argument in this appeal, appellant's claim would necessarily fail. This is because opening and closing statements fall under the rubric of "trial strategy." Id., at ¶ 14, 18. As previously stated, a reviewing *Page 81 
court must refrain from second-guessing trial strategy decisions.State v. Adams, 103 Ohio St.3d 508, supra, at ¶ 31; Strickland v.Washington (1984), 466 U.S. 668, 689.
 {¶ 246} For all of the foregoing reasons, we find that appellant has failed to establish a claim for ineffective assistance of counsel. Accordingly, his fifth assignment of error is found not well-taken.
 {¶ 247} Appellant argues in his sixth assignment of error that his right to a fair trial was compromised by prejudicial prosecutorial overreaching and misconduct. In reviewing a claim for prosecutorial misconduct, an appellate court must determine: (1) whether the prosecutor's actions were improper; and (2) if so, whether the prosecutor's remarks prejudicially affected the substantive rights of the defendant. State v. Smith (1984), 14 Ohio St.3d 13, 14, citingUnited States v. Dorr (C.A.5. 1981), 636 F.2d 117, 120. The analysis must focus on "the fairness of the trial, not the culpability of the prosecutor." State v. Davis, 116 Ohio St.3d 404, 2008-Ohio-2,¶ 231, citing Smith v. Phillips (1982), 455 U.S. 209, 219. The prosecutor's conduct cannot serve as grounds for a new trial unless such conduct deprives the defendant of a fair trial. State v. Keenan (1993),66 Ohio St.3d 402, 405.
 {¶ 248} "Even where a prosecutor's statements during closing arguments are improper, reversal based upon those statements is warranted only if the statements permeate the entire atmosphere of the trial." State v.Walls (Dec. 11, 2000), 12th Dist. No. CA99-10-174. An appellate court must bear in mind when reviewing the record that *Page 82 
both the defense and the prosecution are given wide latitude in their arguments as to what the evidence has shown and what reasonable inferences may be drawn therefrom. Id.
 {¶ 249} When evaluating the prosecutor's arguments for possible misconduct, the court must review the argument as a whole and in relation to that of opposing counsel. Id., citing State v. Moritz
(1980), 63 Ohio St.2d 150, 157-158. If the prosecutor does state an opinion, it must be based on the evidence presented, and not on personal beliefs. See State v. Watson (1991), 61 Ohio St.3d 1, 10.
 {¶ 250} In this assignment of error, appellant suggests that the state in its closing "disavowed" previously-admitted evidence of "devil-worship." Specifically, appellant objects to that portion of the state's closing argument wherein the prosecutor stated:
 {¶ 251} "You listened to this evidence. You heard what took place in the sacristy. Is this some sort of satanic cult killing? No. Was this part of some ritualistic black mass? No. Sorry to disappoint. This case is about perhaps the most common scenario there is for a homicide. A man got very angry at a woman, and the woman died. The only thing different is the man wore a white collar, and the woman wore a habit."
 {¶ 252} Appellant argues that these remarks constitute "misconduct" and demonstrate a prejudicial "bait and switch tactic" on the part of the state. Contrary to appellant's contention, the state never offered the "bait" that this homicide was a satanic endeavor on the part of appellant. Instead, throughout the trial, the state's position was that appellant was motivated by anger with Sister Pahl. This motive was suggested by *Page 83 
the state in its opening statement and then supported by the state's evidence at trial. During closing argument, the state summarized the evidence and explained how it supported the state's theory that anger motivated this crime.
 {¶ 253} In a related argument, appellant takes issue with the state's argument that this was a case involving anger, "since there was noevidence that appellant had ever been violent or even angry with anyone in his lifetime * * *." (Emphasis in original.) But, in fact, there was evidence that the perpetrator was angry. Det. Marx testified that the sheer number of stab wounds that the assailant inflicted upon the victim were indicative of a high level of anger on the part of the assailant. In addition, Father Grob repeatedly testified that what took place in the sacristy was meant to mock the victim, the Catholic Church, or God. On the basis of this evidence, the jury could reasonably have inferred that the perpetrator was angry. Other evidence that was presented by the state permitted the inference that appellant was the perpetrator.
 {¶ 254} Appellant next objects to the state's arguments concerning the blood found on the victim's forehead — in particular, to the state's argument that appellant used his letter opener to "anoint the victim in her own blood" in a "bastardized version of the last rites." But the evidence did show an obvious, circular, mark of blood on the victim's forehead without any corresponding wound to explain the blood. The evidence also showed that at some point the entire letter opener was saturated with blood from the tip to the hilt, and that the circular stain on Sister Pahl's forhead was consistent, in size and *Page 84 
shape, with a raised circular surface that was located near the letter opener's hilt. From this evidence, the jury could reasonably have inferred that the killer caused the entire letter opener to be coated with blood and then placed the blood-soaked letter opener across Sister Pahl's forehead in an act mirroring the anointing process of the Catholic ritual of last rites. Testimony by Father Grob established that the ritual of the last rites involves the anointing of the forehead of a dying person, and is an act which can only be performed by a priest. Based on the foregoing, we find that the state's arguments were fairly based on reasonable inferences and, therefore, were proper.
 {¶ 255} Next, appellant claims error because the state argued that the assailant "carved" an upside-down cross in her chest. At trial, Det. Cousino testified that the nine stab marks that outlined an upside-down cross pattern in the altar cloth that had covered Sister Pahl's chest were also observable in the smock that Sister Pahl was wearing at the time of her death. Although this testimony specifically refers to stab marks that were on cloths that were covering the victim's body, and not necessarily to stab marks that were on the victim's body, we note that such testimony was not contradicted by any autopsy findings. As indicated above, trial counsel are granted wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom. State v. Walls, supra. Further, we do not find that the state's comment, when viewed within the state's argument as a whole, prejudicially affected appellant's substantive rights. See State v.Smith, supra, at 14. *Page 85 
 {¶ 256} Appellant also claims reversible error based on the state's argument that the evidence showed that the victim had been vaginally penetrated. The autopsy confirmed evidence of a scratch on the right side of the victim's labium and hymen. In addition, there was a police report containing Dr. Fazekas' opinion that the abrasion may have been caused by a fingernail or a rough instrument, and may have been inflicted to mislead investigators into thinking a rape had been committed. Thus, there was sufficient foundation for the prosecutor's argument that the victim had been penetrated. The prosecutor did not suggest that the penetration was conducted for purposes of sexual gratification, but rather that it was conducted as an expression of anger and degradation.
 {¶ 257} Appellant also objects to the state's arguments that the DNA that was found in the sacristy was the result of contamination. In making this argument, the state was merely summarizing evidence presented at trial which indicated that, although efforts were made to test those involved in the chain of custody of Sister Pahl's clothing, the list of those tested was not exhaustive, and that many who came in contact with the murder scene, especially after Sister Pahl's body was discovered — such as the emergency medical team — could have contaminated the evidence. The significance of the DNA evidence, and the fact that such evidence could have been the result of contamination, were properly argued by the state in this case.
 {¶ 258} Next, appellant objects to the state's characterization of appellant's expert witness, Kathleen Reichs, Ph.D., as a "hired gun." The state's primary criticisms of this *Page 86 
expert were that she never examined the evidence and that she never attempted to discuss her opinions with the other experts in the case. In referring to Reichs as a "hired-gun," the state did not act improperly, nor did it affect appellant's substantive rights. See State v.Smith, supra, at 14.
 {¶ 259} The prosecutor also made a comment in response to defense counsel's contention that a nickel could have made a blood transfer stain, rather than the letter opener's medallion, because "a picture of Congress" is on the back of a nickel. The state's comment was, "[I]f you see [defense counsel] on the street, do not take a nickel from him because the Capitol Building is not on the back of a nickel. The Monticello is." Defense counsel countered this comment by joking, "I only have dollar bills." In addition, the prosecutor made a comment with regard to defense counsel's tracing of one of the bloodstains on the altar cloth, stating that it looked like the drawing of a third-grader. Neither of these comments was improper. Nor did they prejudicially affect appellant's substantive rights. See State v. Smith, supra, at 14.
 {¶ 260} Finally, appellant argues that the state improperly made a "golden rule" type of argument. "Golden rule" arguments are generally prohibited in closing arguments. City of Akron v. Norman, 9th Dist. No. 22743, 2006-Ohio-769, ¶ 27. The reason they are prohibited is that they improperly seek to invoke the sympathy or prejudice of the jury by asking the jury to step into the shoes of another. State v. *Page 87 
 Roberson (June 23, 1982), 5th Dist. No. 5828. As stated by the court in State v. Roberson:
 {¶ 261} "The `golden rule' technique of argument to a jury runs afoul of [the] clear limitation upon the right of the attorney to comment upon the evidence as opposed to appealing to the passion or sympathy of the jury. `Do unto others as you would do unto me' carries an improper implication in final argument." Id.
 {¶ 262} In this case, the prosecutor's request that the jury bring justice for Sister Pahl was not only proper, but it was patently not a "golden rule" request, because the prosecutor did not ask that the jury put itself in the shoes of the victim.
 {¶ 263} We note, in our examination of this particular assignment of error, that the trial court specifically instructed the jury that closing arguments are not to be considered evidence. Because the jury is presumed to follow the trial court's instructions, State v. Raglin
(1998), 83 Ohio St.3d 253, 264, we presume that the jury followed this instruction in its deliberations and based its conviction upon the evidence alone.
 {¶ 264} We additionally note that appellant's trial counsel failed to object to many of the state's closing remarks. When a defendant fails to object to the state's remarks made during closing arguments, a plain error analysis under Crim. R. 52(B) is required. State v. Poling, 11th Dist. No. 2004-P-0044, 2006-Ohio-1088, ¶ 33. "`Plain error does not exist unless, but for the error, the outcome at trial would have been different.'" Id., *Page 88 
quoting State v. Jenks (1991), 61 Ohio St.3d 259, at 282. Under this standard, appellant clearly fails to establish that there was prosecutorial misconduct in this case.
 {¶ 265} Even without the plain error analysis, however, we find that appellant simply has not established either that the state's closing arguments were improper or that they prejudicially affected his substantive rights. See State v. Smith, supra, at 14. Accordingly, appellant's sixth assignment of error is found not well-taken.
 {¶ 266} Appellant argues in his seventh assignment of error that the trial court erred in denying his motion to suppress his 2004 statements to police.
 {¶ 267} Appellate review of a trial court's decision to grant or deny a motion to suppress presents a mixed question of law and fact.State v. Cheadle, 11th Dist. No. 2007-P-0083, 2008-Ohio-2393,¶ 10. In conducting this review, we accept the trial court's findings of fact, as long as they are supported by competent and credible evidence. Id. Upon accepting the trial court's factual determinations, we conduct a de novo review to determine whether the legal standard has been satisfied. State v. Jeffries, 11th Dist. No. 2005-L-057, 2007-Ohio-3366,¶ 56.
 {¶ 268} In the instant case, appellant argues that evidence obtained during his April 23, 2004 interview with police should have been suppressed, because prior to the interview he was not advised of his rights pursuant to Miranda v. Arizona (1966), 384 U.S. 436. *Page 89 
 {¶ 269} Only a `custodial interrogation' triggers the requirement to provide Miranda warnings. State v. Mason (1998), 82 Ohio St.3d 144, 153; see also, State v. Gumm (1995), 73 Ohio St.3d 413, 429; State v.Luke, 3d Dist. No. 1-06-103, 2007-Ohio-5906, ¶ 10. "Custodial interrogation" has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."Miranda, supra, at 444.
 {¶ 270} "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but `the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" Stansbury v. California (1994), 511 U.S. 318, 322, quotingCalifornia v. Beheler, 463 U.S. 1121, 1125. To determine whether a custodial interrogation has occurred, a court must decide how a reasonable man in the suspect's position would have understood his situation. Mason, supra, at 154, quoting Berkemer v. McCarty (1984),468 U.S. 420, 442.
 {¶ 271} As long as it remains undisclosed, a police officer's subjective view that an individual under questioning is a suspect has no bearing upon the question of whether that individual is in custody.Stansbury, supra, at 324. But if the officer's knowledge or belief is conveyed — either by word or deed — to the individual being questioned, such knowledge or belief may bear upon the issue of custody, but only to the extent that it *Page 90 
would have affected how a reasonable person in the position of the individual being questioned would have perceived his freedom to leave. Id., at 325.
 {¶ 272} In the instant case, the trial court made the following relevant factual determinations, all of which were supported by competent and credible evidence. The April 23, 2004 interview took place in appellant's home. The interview was conducted by officers wearing plainclothes, who knocked on appellant's door. When appellant answered the door, the officers identified themselves and indicated to him that they wanted to question him about the April 1980 death of Sister Pahl.
 {¶ 273} Appellant invited the investigators into his home, and offered them seats in the living room. During the entire 1-1 1/2 hours during which the interview took place, appellant was never handcuffed, restrained, threatened, or told that he could not leave. Appellant, himself, did not instruct the investigators to leave. Nor did he ask for an attorney or attempt to leave the residence.
 {¶ 274} Applying these facts to the applicable law, we conclude that a reasonable man in appellant's position would have understood that, during the interview, there was no formal arrest or restraint on his freedom of movement of the degree associated with a formal arrest. SeeStansbury, supra, at 322. Accordingly, we find that appellant was not subject to custodial interrogation during his interview of April 23, 2004. Appellant's motion to suppress was properly denied. *Page 91 
 {¶ 275} In an effort to avoid this conclusion, appellant points out that appellant had long been the focus of the police investigation and that during the course of the interview he was actually accused by the investigators of killing Sister Pahl. Review of the testimony reveals that this accusation occurred at the "very end" of the interview, after appellant had told Ross that he had exclusive control over the letter opener that was believed to be the murder weapon. Following the accusation, police and appellant had no additional discussion.
 {¶ 276} Based on the foregoing, we find that because the investigators' belief about appellant's guilt became known to appellant only at the very end of the interview, when appellant heard Ross' accusation, such belief would not have affected how a reasonable person in appellant's position would have perceived his freedom to leave during the previous 1-1 1/2 hour period when the interview actually took place. See Stansbury, supra, at 324.
 {¶ 277} For all of the foregoing reasons, appellant's seventh assignment of error is found not well-taken.
 {¶ 278} Finally, in his eighth assignment of error, appellant argues that he is entitled to a reversal of his conviction because, when viewed cumulatively, the otherwise harmless errors that were committed in the trial court deprived appellant of a fair trial.
 {¶ 279} We have stated that "although a particular error by itself may not constitute prejudicial error, the cumulative effect of the errors may deprive a defendant of *Page 92 
a fair trial and may warrant the reversal of his conviction." State v.Hemsley, 6th Dist. No. WM-02-010, 2003-Ohio-5192, ¶ 32, citing State v.DeMarco (1987), 31 Ohio St.3d 191, paragraph two of the syllabus. "`However, in order even to consider whether "cumulative" error is present, we would first have to find that multiple errors were committed in this case.'" Id., at ¶ 32, quoting State v. Madrigal,87 Ohio St.3d 378, 398, 2000-Ohio-448. In light of our findings with respect to the other assignments of error, we find the eighth assignment of error not well-taken.
 {¶ 280} This conclusion is not altered by additional so-called "errors" that appellant brings to the court's attention, for the first time, in this assignment of error. First, appellant argues that it was error that the jury was permitted to speculate "about the content of appellant's admittedly unintelligible videotaped 2004 statement." In this statement, which lasted one hour and 28 minutes, appellant was interviewed at a police station. At the very end of the interview, appellant was left alone in the interview room for three minutes and 15 seconds. While alone, appellant can be heard mumbling to himself. The admission of this final portion of the interview does not constitute reversible error. Not only did appellant fail to object to this portion of the tape, his defense team wanted it played and tried its best to make this portion of the tape audible for the jury.
 {¶ 281} Appellant also claims error because two witnesses, namely Jerry Tressler and Rose Byers, saw part of the trial proceedings on television. These two witnesses *Page 93 
were under no explicit order to refrain from watching television coverage. These witnesses were questioned on voir dire by the court and counsel. Jones expressly stated that what little she heard on television would not affect her testimony. The trial court agreed. Tressler stated that what he saw on television would not influence his in-court testimony. The trial court ruled that the testimony of both witnesses was admissible. We note that, pursuant to Evid. R. 103, "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]" Appellant had a full opportunity to cross-examine as to the weight to be given the testimony. No error of any kind occurred.
 {¶ 282} Appellant also claims that various hearsay statements were admitted into evidence which resulted in error in this case. Specifically, appellant complains about the following testimony that came into evidence, over appellant's objection, through the testimony of Det. Forrester: (1) Scala-Barnett's opinion that the letter opener was consistent with the puncture wounds; (2) Scala-Barnett's opinion that scissors were not used; (3) Cousino's inverted-cross opinion; (4) Sutton's transfer pattern opinion; and (5) Grob's opinion as to knowledge of religion or anti-religion. Appellant additionally complains that investigator Ross repeated the opinions offered by Scala-Barnett and Cousino.
 {¶ 283} We initially observe that none of the referenced statements constituted hearsay, because they were not offered for the truth of the matter asserted. See *Page 94 
Evid. R. 801(C). They were offered to explain the sequence of how the cold case portion of the investigation developed. We additionally observe that the "declarant" of each of the challenged statements had already testified in detail before anything was later repeated by subsequent witnesses. Thus, by the time Forrester and Ross gave the testimony to which appellant objects, the jury had already heard the testimony, which was properly admitted and subjected to thorough cross-examination by the defense.
 {¶ 284} Appellant next claims error because the state referenced a letter written by Father Ray Fisher while cross-examining defense witness Deputy Police Chief Ray Vetter. During the state's cross-examination, Vetter was asked if he made certain statements that were attributed to him and referenced in a letter authored by Father Ray Fisher to Bishop Hoffman of the Catholic Diocese. We note that referring to a document during cross-examination is not improper. And appellant could have offered the letter into evidence had he so desired.
 {¶ 285} Lastly, appellant complains that the jury did not receive proper instructions on the law of circumstantial evidence and on the presumptive nature of the 1980 coroner's verdict. In fact, the trial court did give proper instruction as to the law of circumstantial evidence. And the defense never requested an instruction as to a coroner's verdict.
 {¶ 286} For all of the foregoing reasons, the judgment of the trial court is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App. R. 24. *Page 95 
Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., William J. Skow, J. CONCUR.
[1] Early in the trial proceedings, defense counsel — over vigorous objection by the state — persuaded the trial court to admit into evidence as "ancient documents" police reports from 1980 that contained statements from third-party interviewees. Although appellant now claims that the admission of such evidence was in violation of appellant's confrontation rights under Crawford v. Washington (2004), 541 U.S. 36
and Davis v. Washington (2006), 547 U.S. 813, we find that any such rights were knowingly, intelligently, and voluntarily waived by appellant at trial. See State v. Smith, 3d Dist. No. 1-05-39,2006-Ohio-1661; State v. Urbina, 3d Dist. No. 4-06-21, 2008-Ohio-1013. Appellant's decision to waive these rights was clearly in the nature of a trial strategy decision and, therefore, it will not be second-guessed by this court. See State v. Mason, 82 Ohio St.3d 144, 157.
[2] Dr. Fazekas was deceased at the time of trial. Any statements of hers that were admitted at trial came either from her own reports or from police reports of conversations with her. We note that autopsy reports and related test findings are not testimonial and do not violate the confrontation clause. State v. Craig, 110 Ohio St.3d 306,2006-Ohio-4571, ¶ 88. And, as indicated in footnote 1, supra, the police reports from 1980 were admitted as ancient documents.
[3] The record is unclear as to which priest Sister Pahl may have been upset with. Although Assistant Chaplain Father Swiatecki was the celebrant at the Good Friday services on the day before the homicide, appellant was the Senior Chaplain at the hospital.
[4] There was additional evidence that Margaret Warren, a receptionist who worked in the area where Langston heard the footsteps, herself heard frantic footsteps in the same portion of the building that morning. At the time of trial, however, Warren was deceased, and the only evidence of what she heard was contained in a police report from April 22, 1980. Both appellant and the state acknowledge that the April 22, 1980 police report has at least one factual error concerning the timing of events. That is, according to the police report, Warren stated that she arrived at work at 8:35 a.m. and heard footsteps at approximately 8:50 a.m. But according to Warren's time card from that date, it is clear that she actually arrived at work at 7:35 a.m., an hour earlier than is stated in the police report. In light of this discrepancy, whether she meant to say that she heard footsteps at 7:50 a.m. or 8:50 a.m. is reasonably a matter of debate.
[5] Although Det. Marx's notes from the April 18, 1980 interview were missing at the time of trial, evidence in the form of a polygraph examination request that he had completed on April 19, 1980, corroborated his account of appellant's statements regarding the alleged confession.
[6] The contents of the letter were discussed on the record between counsel and the judge, out of the presence of the jury. According to these discussions, a nun had alleged in the letter that she had been victim of ritualistic sexual abuse performed by multiple individuals. The group sex allegations did not include appellant. However, the letter did accuse appellant of individual sadomasochistic sexual abuse.
[7] The altar cloth, when unfolded, actually shows 18 stab marks, essentially marking two mirror-image crosses. This is because, at the time Sister Pahl was stabbed, the altar cloth was folded in half.
[8] Audrey Garraway, a dietary assistant, had seen Sister Pahl some minutes earlier, at approximately 6:15 a.m., in the nuns' dining room.
[9] Byers, who worked the 11 p.m. to 7 a.m. shift at the hospital, testified at trial that on April 5, 1980, she followed the same routine she had followed for the past 18 to 20 years. That is, at the end of her shift, she took the report from that shift, dropped it off at Sister Gerold's office, then went to the chapel for a few minutes to say a prayer. Byers recalled that on April 5, 1980, for the first, and only, time during her tenure with Mercy Hospital, she was unable to get into the chapel after dropping off the report because the chapel doors were locked.
[10] At trial, Richard Kerner corroborated Leslie Kerner's testimony about what she had told him in April 1980.
[11] At trial, retired Toledo Police Sgt. Ulysses Howard testified that Grace Jones had told him within a year of the homicide that on the day of the homicide, while she was waiting for the elevator, she had seen a priest coming from the area of the chapel, carrying a bag.
[12] The evidence showed that appellant lived on the same level of the hospital as the chapel, but in a different structure called the Professional Building. The hospital, where the chapel was housed, and the Professional Building were connected by a short enclosed footbridge. When Langston heard the footsteps, he was cleaning the floor under the balcony in the Professional Building. From the lobby of the Professional Building, one could look up to the balcony which overhung part of the lobby. Located near this balcony was appellant's apartment. Because April 5, 1980 was Holy Saturday, the Professional Building was essentially devoid of occupants.
[13] Although appellant told police in 2004 that he was dripping wet from his morning shower when he answered the telephone and received news of Sister Pahl's murder, in 1980 he claimed that he was just finishing getting dressed when he answered the telephone and received the news of Sister Pahl's death.
[14] Sister Gordon testified at trial that she, in the company of other nuns, saw Father Swiatecki in the cafeteria at the time of the homicide. She further testified that after breakfast, she and one or two other nuns — together with Father Swiatecki — left the dining room and started heading toward the chapel.
In addition, testimony by Sgt. Forrester established that the whereabouts of all of the nuns had been satisfactorily accounted for by other witnesses.
[15] See footnote 3, supra.
[16] In doing so, the state emphasized that showing why the crime might have occurred was not part of its burden of proof.
[17] Missing evidence that does not necessarily exculpate a defendant and, therefore, cannot support a finding of actual prejudice, may still be used to attack the credibility of the state's evidence. State v.Gulley, supra. In addition, issues concerning why evidence is missing and what the evidence would have shown may well be relevant to trial. Id.
[18] Although appellant correctly points out that the state argued to the jury that the discrepancy in the two stories was proof that appellant had lied to authorities about what he was doing at the time he learned of Sister Pahl's death, we find that the jury could just as well have concluded that the discrepancy was of no material significance whatsoever, or even that it came as a result of Lt. Weigand's faded 24 year-old memory.
[19] Again, whether this is truly an incriminating statement is properly a matter of debate, especially in light of testimony by other witnesses who had variously described the victim as a "perfectionist," as one who could be "very, very strict," "very stern," and as one who would not hesitate to state her opinions.
[20] For details about the testimony that was agreed to, and our analysis concerning its admissibility at trial, see our discussion,supra, of appellant's third assignment of error.
[21] We note that, even if appellant had proceeded to a hearing, his motion in limine would have been denied. As we found in our discussion of appellant's third assignment of error, Father Grob's testimony was proper and admissible. *Page 1